# In the United States Court of Federal Claims

No. 09-667C
Filed: June 30, 2010
Reissued: July 14, 2010[*]
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| COASTAL INTERNATIONAL SECURITY, INC., | Administrative Procedures Act, 5 U.S.C. § 706; |
| Plaintiff, | Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320; Intervenor, RCFC 24(a); Judgment on the Administrative Record, RCFC 52.1; |
| v. | 41 U.S.C. § 253b(d)(3); Federal Acquisition Regulations, |
| THE UNITED STATES, | 2.101 (Performance Based Acquisition); 15.3 (Source Selection); |
| Defendant, | 15.306(d)(3) (Exchanges); 15.4 (Contract Pricing); |
| and | 16.5 (Indefinite Delivery Contracts); 37.102 (Service Contracts); |
| WACKENHUT SERVICES, INC., | Independent Government Estimate; National Aeronautics and Space Administration, Federal Acquisition Regulation Supplement 15.101, 15.303, 15.305, 1815.370(h)(2), |
| Defendant-Intervenor. | Post-Award Bid Protest; Prejudice; Standing. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Seth C. Berenzweig, John W. Polk, Terrence M. O'Connor,** and **Stephanie D. Wilson,** Albo & Oblon, LLP, Arlington, Virginia, Counsel for Plaintiff.

**Daniel G. Kim,** United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Richard J. Webber, Kevin R. Pinkey,** and **Kavitha J. Babu,** Arent Fox, LLP, Washington, D.C., Counsel for Defendant-Intervenor.

---

[*] On June 30, 2010, the court issued this Memorandum Opinion and Order under seal and instructed the parties to propose any redactions on or before the end of business on July 14, 2010. On July 13, 2010, counsel for the Government notified the court that the parties had conferred and agreed that no redactions were required.

**MEMORANDUM OPINION AND ORDER**

**BRADEN,** *Judge.*

In *Wackenhut Servs., Inc.* v. *United States*, 85 Fed. Cl. 273 (2008) ("*Wackenhut*"), the court set aside a $1.186 billion National Aeronautics and Space Administration ("NASA") contract for protective services (the "NPS Contract") that was awarded to Coastal International Security, Inc. ("CIS") and ordered NASA, if it decided to proceed with the procurement, to appoint a "re-constructed" Source Evaluation Board and Source Selection Authority to re-evaluate three evaluation Subfactor ratings, emphasizing the need for both reviewing entities to explain:

> [T]he . . . reasons for arriving at final adjectival ratings, point scores, and any increase thereof.  The [Source Evaluation Board] will then issue reconsidered Final Findings.  In addition, NASA is hereby ordered to appoint a new [Source Selection Authority ("SSA")] to evaluate the reconsidered Final Findings and . . . issue a reconsidered Source Selection Authority Final Decision, explaining, in detail, the SSA's reasons for determining whether [Wackenhut's] or CIS's proposal provides the 'best value' to the Government[.]

> The court emphasize[d] that NASA is expected to correct the [Federal Acquisition Regulation] and [Administrative Procedures Act] violations, discussed herein, and to address the court's concern that the SEB's reconsidered Final Findings reflect the SEB's *independent* evaluation and that the SSA's reconsidered Final Source Selection Decision reflect the SSA's *independent and considered judgment* as to the proposal that provides the 'best value' to the Government.

*Id*. at 312-13 (emphasis in original).

Thereafter, NASA engaged in a conscientious effort to comply with the Court's December 15, 2008 Memorandum Opinion and Order, but reached a different result, awarding the NPS Contract to Wackenhut Services, Inc. ("WSI").  CIS responded with this post-award bid protest.

To facilitate a review of this Memorandum Opinion and Order, the court has provided the following outline:

**I.      RELEVANT FACTS.**

     **A.      The Prior Protest.**

     **B.      The National Aeronautics And Space Administration's Response.**

          **1.      New Procedures Established.**

          **2.      The Initial Evaluation Of The 2009 Source Evaluation Board.**

      **3.**      **The Initial Presentation Of The 2009 Source Evaluation Board To The 2009 Source Selection Authority.**

      **4.**      **The Final Evaluation Of The 2009 Source Evaluation Board.**

      **5.**      **The Final Presentation Of The 2009 Source Evaluation Board To The 2009 Source Selection Authority.**

      **6.**      **The 2009 Source Selection Authority's Source Selection Statement And Contract Award.**

**II.**     **PROCEDURAL HISTORY.**

     **A.**     **Before The United States Government Accountability Office.**

     **B**.     **Before The United States Court Of Federal Claims.**

**III.**    **JURISDICTION.**

     **A.**     **Jurisdiction.**

     **B.**     **Standing.**

        **1.**      **Plaintiff's Standing.**

            **a.**     **Governing Precedent.**

            **b.**     **The Court's Resolution.**

        **2.**      **The Defendant-Intervenor's Standing.**

            **a.**     **Governing Precedent.**

            **b.**     **The Court's Resolution.**

**IV.**    **APPLICABLE STANDARDS OF REVIEW.**

**V.**     **DISCUSSION.**

     **A.**     **Count III - Whether 41 U.S.C. § 2635(d)(3), FAR 15.303, and FAR 15.305 Were Violated By The 2009 Source Selection Board And The 2009 Source Selection Authority's Consideration Of Future Task Orders For Launch And Landing Staffing At The Kennedy Space Flight Center.**

        **1.**      **Allegations In Count III Regarding The 2009 Source Selection Board.**

            **a.**     **Parties' Arguments.**

          **i.**      **The Plaintiff's Motion.**

          **ii.**     **The Government's Cross-Motion.**

          **iii.**    **The Defendant-Intervenor's Cross-Motion.**

          **iv.**    **The Plaintiff's Response.**

          **v.**     **The Government's Reply.**

          **vi.**    **The Defendant-Intervenor's Reply.**

      **b.**    **The Court's Resolution.**

   **2.**    **The Allegations in Count III Regarding The 2009 Source Selection Authority.**

      **a.**    **The Parties' Arguments.**

          **i.**      **The Plaintiff's Argument.**

          **ii.**     **The Government's Cross-Motion.**

          **iii.**    **The Defendant-Intervenor's Cross-Motion.**

          **iv.**    **The Plaintiff's Response.**

          **v.**     **The Government's Reply.**

          **vi.**    **The Defendant-Intervenor's Reply.**

      **b.**    **The Court's Resolution.**

**B.**    **Count IV - Whether The 2009 Source Evaluation Board Findings And The 2009 Source Selection Authority's Award Decision Lacked A Rational Basis In Violation Of 5 U.S.C. § 706, Because The National Aeronautics Space Administration Did Not Know Its Own Requirements At Kennedy Space Center.**

   **1.**    **The Allegations In Count IV.**

   **2.**    **The Parties' Arguments.**

      **a.**    **The Plaintiff's Motion.**

**b.      The Government's Cross-Motion.**

**c.      The Defendant-Intervenor's Cross-Motion.**

**d.      The Plaintiff's Response.**

**e.      The Government's Reply.**
**f.      The Defendant-Intervenor's Post Hearing Supplemental Brief.**

**g.      Plaintiff's Closing Brief.**

**3.     The Court's Resolution.**

**C.     Count V - Whether The 2009 Source Selection Authority's Award Decision Was Arbitrary And Capricious.**

**1.     The Allegations in Count V.**

**2.     The Parties' Arguments.**

**a.      The Plaintiff's Motion.**

**b.      The Government's Cross-Motion.**

**c.      The Defendant-Intervenor's Cross-Motion.**

**d.      The Plaintiff's Response.**

**e.      The Government's Reply.**

**f.      The Defendant-Intervenor's Reply.**

**3.     The Court's Resolution.**

**D.     Count VI – Whether The 2009 Source Selection Authority Engaged In An Improper Trade-Off Analysis.**

**1.     The Allegations In Count VI.**

**2.     The Parties' Arguments.**

**a.      The Plaintiff's Motion.**

**b.      The Government's Cross-Motion.**

**c.      The Defendant-Intervenor's Cross-Motion.**

        **d.**        **The Plaintiff's Response.**

        **e.**        **The Government's Reply.**

        **f.**        **The Defendant-Intervenor's Reply.**

    **3.**    **The Court's Resolution.**

**VI.**    **CONCLUSION.**

\* \* \*

## II.    RELEVANT FACTS.[1]

To understand the contested issues in this bid protest, a summary of the relevant facts in the prior *Wackenhut* protest is required.

### A.    The Prior Protest.

On September 14, 2007, NASA issued a Solicitation, Request For Proposal NNX077040R ("Solicitation") requesting offers to provide protective services for 14 NASA facilities located throughout the United States.  AR Tab 63, at 17045; AR Tab 98, at 25560.  Those "protective services" included: security services; fire fighting and prevention services; emergency response and management services; export control services; information assurance services; and training services.  AR Tab 63, at 17046-47.  Previously, NASA procured these services through individual contracts at each individual NASA facility.  AR Tab 63, at 17287.  A principal objective of the NPS Contract was to consolidate all protective services under one agency-wide contract to "achieve uniformity, standardization, and where appropriate, centralization of protective services across the Agency[.]"  AR Tab 63, at 17045.

The Solicitation stated that the NPS Contract was for an Indefinite Delivery/Indefinite Quantity ("ID/IQ") firm fixed-price ("FFP").  AR Tab 63, at 17258.  The base period was a five-year term, with five potential one-year options.  AR Tab 63, 16977-79.  The Solicitation set the Not-To-Exceed ("NTE") amount of the contract at $1.3 billion, including potential option years.  AR Tab 63, at 16980.  After the bid proposals were received, NASA increased the NTE by $25 million, because both competitive range proposals exceeded the NTE in the option years.  AR Tab 98, at 25574.  To accommodate additional task orders, NASA reserved the right to increase the NTE amount by 20% of the total fixed price.  AR Tab 63, at 16980.

The Solicitation also provided that the NPS Contract would be structured in two parts: Part 1 contained the base ID/IQ contract that sets forth the framework for the agency-wide contract;

---

[1] The facts cited herein were derived from nineteen volume Administrative Record ("AR 1-26127").  Citations to the Administrative Record herein include both the AR "Tab" and page number.

Part 2 contained the comprehensive protective services task orders for each of the 14 NASA facilities.  AR Tab 63, at 17045-47.  These site-specific task orders were to be issued by individual NASA facilities to the successful offeror after the basic NPS Contract was awarded.  AR Tab 63, at 17045.  Both the basic NPS contract and each of the contemplated site-specific task orders included a Performance Work Statement ("PWS").  AR Tab 63, at 17048.  The PWS for the base NPS Contract described the "protective services available for inclusion in this contract," whereas the PWS's for the site-specific task orders detailed the required protective services specific to each of NASA's facilities, including the Kennedy Space Flight Center ("KSC").  AR Tab 63, at 17048.

In addition, the Solicitation provided that all proposals would be evaluated by a Source Evaluation Board ("SEB"), that would report its findings to a Source Selection Authority ("SSA"),[2] who was responsible for issuing a Final Source Selection Decision.  AR Tab 63, at 17320.

The Solicitation advised that this procurement was a "competitive negotiated acquisition conducted in accordance with FAR Part 15.3 'Source Selection,' and [NFS], 1815.3, same subject."  AR Tab 63, at 17320.  More importantly, the NPS Contract was to be awarded to the "responsible Offeror whose proposal results in the *best value* to the Government."  AR Tab 63, at 17320 (emphasis added).

The largest of the 14 locations covered by the NPS Contract was KSC.  AR Tab 103, at 25936.  Increased public interest in special events at KSC, such as the launch and landing of the Space Shuttle and other space vehicles required additional protective services personnel for this site.  AR Tab 64, at 17889.  Accordingly, the Solicitation required that the contractor provide protective services for "Planned Special Events."  AR Tab 64, at 17889.  This requirement was described in the PWS as follows:

> The contractor shall provide protective services for anticipated special events such as, *Launch Operations*, Center Open House, Safety Day, Employee Picnics, Recreational Events and other planned but infrequent activities specified in the Task Order requiring increased effort and additional personnel above that required for normal daily operations.  The contractor shall be required to provide timely and responsive support for such events.  *Planned special events shall not necessitate modification to or issuance of an additional Task Order and shall be considered to be within the scope of the priced Task Order.*

AR Tab 64, at 17889 (emphasis added).

Additional protective services specific to launch and landing, however, were to be procured by a separate task order.  AR Tab 64, at 17889.  Directly below the PWS description of "Planned

---

[2] For most procurements, responsibility for the selection decision is delegated to the contracting officer.  *See* FAR 15.303.  In more formal and complex procurements such as this one, the agency head may delegate this responsibility to the "Source Selection Authority" or SSA.  *Id.*; *see also* RALPH C. NASH JR., THE GOVERNMENT CONTRACTS REFERENCE BOOK 483 (2d ed. 1998).

Special Events," the following express exclusion of only additional security requirements for launch and landing was provided:

> At KSC, the contractor, in conjunction with the TOM [Task Order Manager], will develop a comprehensive launch protective services plan.  This plan will be priced
>
> and implemented as a *separate* ID/IQ Task Order on an annual[] basis or prior to each launch.

AR Tab 64, at 17889 (emphasis added).

On October 29, 2007, NASA issued Amendment 5 to the Solicitation, entitled "Final RFP Questions and Answers," listing NASA's answers to questions submitted by potential offerors seeking clarification of the Solicitation.  AR Tab 69, at 18962-19015.  Question No. 183 of Amendment 5 posited:

> The KSC TO [Task Order] requires a comprehensive protective services plan to be prepared annually or prior to each launch.  Since launch operations is the primary mission for KSC it would seem that some further definition of typical surge requirements for launches and landings should be discussed in the TO.  As the historical information provided no information about manpower surges for launch support some defined parameters for protective services that NASA wants during launch operations would allow all bidders to intelligently bid on this task.

AR Tab 69, at 18976.

NASA responded to Question 183 by stating that, "[s]urges for launches and landings shall be determined by ID/IQ in the beginning of the contract start and shall be used for each launch." AR Tab 69, at 18976.  NASA excluded launch and landing staffing surges from Solicitation, because the Space Shuttle program faced potential retirement in December 2010, with manned space-flight operations not scheduled to resume until at least 2015.  Gov't Mot. at 5-6.  For this reason, protective services for launch and landing at KSC were to be implemented and priced separately.  *Id.*

The Solicitation required the SEB to evaluate each proposal against three factors: (1) Mission Suitability; (2) Past Performance; and (3) Price.  AR Tab 63, at 17320-30 ("Section M"). The Solicitation provided that the "Mission Suitability" Factor was more important than the "Past Performance" Factor, however, the "Mission Suitability" and "Past Performance" Factors, when combined, were "significantly more important than the Price [F]actor."  AR Tab 63, at 17330. Only "Mission Suitability," however, was to be numerically scored.  AR Tab 63, at 17320.

The "Mission Suitability" Factor included four numerically weighted Subfactors, each of which had sub-elements, as set forth below:

Factor 1: Mission Suitability

Subfactor: Technical Approach (425 Points)
TA1 – Understanding the Requirements
TA2 – Staffing Plan
TA3 – Innovation and Efficiency

Subfactor: Management Approach (375 Points)
MA1 – Management Plan
MA2 – Phase-In Plan
MA3 – Key Personnel
MA4 – Risk Management

Subfactor: Small Business Participation Approach (100 Points)
SB1 – Small Business Subcontracting
SB2 – Small Disadvantaged Business Participation

Subfactor: Safety and Health Approach (100 Points)
Safety & Health Plan, Safety Record/History

AR Tab 63, at 17321-28.

The Solicitation required offerors to submit a five-volume proposal, broken down as follows: Volumes I-III describing an offeror's overall approach to fulfill the requirements of NPS Contract and task orders within the Factors, Subfactors, and elements described in Section M; Volume IV including an offeror's "Model Contract" for both the base NPS Contract and the 14 site-specific task orders; Volume V containing plans, forms, and other data relevant to the NPS Contract (*i.e.*, subcontracting plans, resumes, and key personnel).  AR Tab 63, at 17269-17302. The site-specific task orders proposals were to be evaluated as part of the Mission Suitability Factor.  AR Tab 63, at 17330.

The SEB was to classify a proposal's strengths or weakness as a: deficiency; significant weakness; weakness; significant strength; or strength.  AR Tab 6, at 176.

The SEB was then responsible for arriving at a consensus decision and assigning an adjectival rating for each Subfactor, accounting for the strengths or weaknesses of each proposal according to the criteria set forth below:

| Adjective Rating | Definitions | Percentile Range |
|---|---|---|
| Excellent | A comprehensive and thorough proposal of exceptional merit with one or more significant strengths. No deficiency or significant weakness exists. | 91-100 |
| Very Good | A proposal having no deficiency and which demonstrates overall competence. One or more significant strengths have been found, and strengths outbalance any weaknesses that exist. | 71-90 |
| Good | A proposal having no deficiency and which shows a reasonably sound response. There may be strengths or weaknesses, or both. As a whole, weaknesses not offset by strengths do not significantly detract from the offeror's response. | 51-70 |
| Fair | A proposal having no deficiency and which has one or more weaknesses.  Weaknesses outbalance any strengths. | 31-50 |
| Poor | A proposal that has one or more deficiencies or significant weaknesses that demonstrate a lack of overall competence or would require a major proposal revision to correct. | 0-30 |

AR Tab 6, at 173, 176.

Next, the SEB was required to assign an exact percentage score within the corresponding range for the adjective rating of each Subfactor.  AR Tab 6, at 173, 177.  This percentage score was to "reflect the consensus view of the relative position of that proposal within the continuum represented by the point scores appropriate to the adjectival rating[.]"  AR Tab 6, at 173.  The resulting exact percentage score, when multiplied by the number of available points for each weighted Subfactor, yielded the total score for the Subfactor.  AR Tab 6, at 177; AR Tab 95, at 25482-83.  The Mission Suitability Factor was scored on a 1000-point scale, with the weighted possible point value for each Subfactor broken down as follows:

| | |
|---|---|
| Technical Approach | 425 |
| Management Approach | 375 |
| Small Business Participation Approach | 100 |
| Safety & Health Approach | 100 |
| Total | 1,000 |

AR Tab 63, at 17321.

On November 30, 2007, NASA received five proposals in response to the Solicitation. AR Tab 86, at 24992. On February 29, 2008, NASA made a competitive range determination eliminating three offers, leaving only CIS and WSI, in the "competitive range." AR Tab 86, at 24992. On April 25, 2008, after concluding discussions, CIS and WSI submitted Final Revised Proposals ("FRP"). AR Tabs 7-29, at 182-6363; AR Tabs 35-58, at 9380-15548. In both proposals, the KSC task order represented a significant portion of the total contract manpower and price, as represented in the table below:

### April 25, 2008 Proposal Comparison

| Offeror | KSC WYE[3] | Total WYE | KSC Task Order | Total Contract Price |
|---------|-----------|-----------|----------------|----------------------|
| WSI | 401.8 | 1604.13 | $416 million | $1.249 billion |
| CIS | 299.8 | 1421.85 | $326 million | $1.186 billion |

AR Tab 29, at 5587; Tab 35, at 9534-74; Tab 51, at 13327; Tab 62, at 15826; Tab 86, at 25061.

A unique characteristic of WSI's proposal was that it included a section entitled: "Short-Term Staffing for Planned Events," *i.e.*:

> Normal workload fluctuations do not require modification to the TO nor issuance of an additional IDIQ Task Order. These fluctuations include several events where increased numbers of Protective Service personnel are needed to ensure the safety of personnel, protection of NASA assets, and ensure that all elements of the PWS are properly performed. These Planned Events include, but are not limited to, items such as picnics, rodeo events, open-house events, air shows, scheduled VIP/dignitary visits, shuttle *launch and recovery operations*, expanded temporary flight operations, etc. *These events are considered to be within the scope of the priced TO as identified in the individual Center TOs*.

AR Tab 7, at 355 (emphasis added).

Although the WSI staffing proposal included personnel to support "launch and recovery operations," contrary to the Solicitation's express exclusion of such launch and landing staffing, the SEB nevertheless rated WSI's staffing as a "significant strength." AR Tab 76, at 23158. On May 20, 2008, however, after the SEB findings were presented, the SSA selected CIS for award of the NPS Contract. AR Tab 77, at 23251-56.

On September 17, 2008, WSI filed a post-award bid protest challenging award of the NPS Contract to CIS in the United States Court of Federal Claims. *See Wackenhut*, 85 Fed. Cl. at 275. On September 18, 2008, the court held an initial status conference at which the parties agreed that

---

[3] NASA measured staffing in Work Year Equivalents ("WYE"). A WYE represents the total available hours for productive work in a year, excluding holidays and paid leave. AR Tab 63, 17289. A WYE may be performed by one or more individuals. AR Tab 63, 17289.

the prospective awardee, CIS, could commence work with NASA to "gear up" performance, while WSI's bid protest was adjudicated.   9/18/2008 TR at 2:33:40-2:36:40.   In exchange, the Government agreed that CIS's performance would not be subsequently cited as a reason to deny WSI injunctive relief.   *Id.*   Preparing for contractor turnover was particularly important at KSC, where the incumbent protective services contract, called the Joint Base Operations Support Contract ("J-BOSC"), was scheduled to expire on March 31, 2009.   AR Tab 102, at 25698.   The incumbent contractor of the J-BOSC was Space Gateway Solutions, LLC. a joint venture between WSI and Northrop Grumman Corporation ("the SGS Joint Venture").   Pl. Mot. at 8, n. 4.

Pursuant to this agreement, in November 2008, NASA and CIS began discussions to provide security for launch and landing at KSC, including a Space Shuttle launch scheduled for February 2009.   AR Tab 118, at 26119-20; Pl. Mot. at 9-10; *see also* Pl. Resp. at 9-10; Gov't Mot. at 24.   On December 2, 2008 CIS submitted an initial task order proposal for this specific launch and landing ("L&L TO"), but NASA rejected this proposal as being overstaffed and too costly.   AR Tab 118, at 26119-20.   On December 10, 2008, CIS submitted a revised proposal that CIS asserts reduced proposed personnel by 50%.   Pl. Mot. at 26.

Before the L&L TO was finalized, however, the United States Court of Federal Claims issued *Wackenhut* setting aside the May 20, 2008 award to CIS, because the SEB failed to provide any written explanation for the increase in CIS's Technical Approach Subfactor point scores between the time of the SEB's Preliminary and Final Findings and the SSA failed to provide any written explanation of the relevant factors considered in the required trade-off analysis, in violation of 5 U.S.C. § 706.   *See Wackenhut*, 85 Fed. Cl. at 294-300, 306-07, 312.[4]

---

[4] This decision was criticized as "seem[ing] to elevate the form of the scoring system over the substance of the source selection decision."   24 Nash & Cibinic Report No. 3 ¶ 13, at 42 (2010) ("Nash & Cibinic Report").   It appears that the commentators thought that the court "demand[ed] an excessive amount of documentation supporting the accuracy of the scoring decision." 23 Nash & Cibinic Report No. 3. ¶ 13 at 44.   To the contrary, the court's concern was that there was *no* documentation or written explanation by the SEB regarding the scoring of the significant Technical Approach Subfactor to what factors the SSA considered required in the critical trade-off analysis and how those factors were evaluated.   *See Wackenhut*, 85 Fed. Cl. at 312-13; *see also Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action and the choice made . . . In reviewing that explanation, we must consider whether the decision . . . was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (emphasis added); *Serco, Inc.* v. *United States*, 81 Fed. Cl. 463, 497 (2008) (holding that "generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions").

After the court issued *Wackenhut*, a collateral investigation was undertaken by NASA's Office of the Inspector General that apparently has generated criminal investigation by the United States Attorney's Office for the District of Columbia, as discussed herein.

B.      The National Aeronautics And Space Administration's Response.

1.      New Procedures Established.

On January 5, 2009, NASA appointed a re-constructed Source Evaluation Board, comprised of five voting members: a Chair, Ms. Monica Green, the Deputy of Institutional Services at Langley Research Center; the Contracting Officer ("CO"), Mr. Ron Sepesi of the Glenn Research Center; two Co-Chairs from the Technical Committee, Mr. Charles Lombard, Director of the Security Management Division, and Mr. Larry Allen, the NPS Contract Program Manager from NASA Headquarters; and the Chair of the Management Committee, Mr. Lloyd Potts, Business Manager for the Protective Services Office at the Marshall Space Flight Center (collectively referred to herein as the "2009 SEB"). AR Tab 4, at 119, 126-39. The 2009 SEB was to be supported by: the Technical Committee, the Management Committee, and the Small Business Committee. AR Tab 4, at 119-21; AR Tab 86, at 24990.

The 2009 SEB was governed by a Source Evaluation Plan Addendum ("SEP Addendum"). AR Tab 6, at 169-81. Pursuant to the SEP Addendum, the 2009 SEB was authorized only to re-evaluate three problematic Subfactors that were identified by the court in *Wackenhut* (*i.e.*, the Technical Approach, Management Approach, and Small Business Subfactors of the Mission Suitability Factor), but using the same weighted numerical scoring method as the SEB in 2008. AR Tab 6, at 174. Thereafter, the 2009 SEB was required to prepare and present findings to a new SSA ("2009 SSA"). AR Tab 6, at 174. The SEP Addendum, however, went further than the court's instructions by directing the 2009 SEB not to engage in any trade-off judgments, either as to individual offerors or evaluation factors. AR Tab 6, at 172 ("The re-constructed SEB will not make recommendations for selection to the newly appointed SSA.") In addition, the SEP Addendum provided:

> During the evaluation process, ex-officio and non-voting members may state their views and contribute to the overall discussion. The Chairperson may invite them to attend reconstructed SEB voting member meetings, or they may be consulted as necessary without attending. In the actual reconstructed SEB voting member deliberations, *ex-officio and non-voting members may not participate in the actual rating/scoring process.* The reconstructed SEB Legal Counsel may be present during rating/scoring sessions, as appropriate.

AR Tab 6, at 172 (emphasis added).

Furthermore, the SEP Addendum required the 2009 SEB to: consider the initial findings of their supporting committees; evaluate each Final Revised Proposal ("FRP"); and reach a consensus[5] regarding the "final reconsidered [2009] SEB findings" for each of the three specific Subfactors to be reconsidered. AR Tab 6, at 173.

---

[5] The SEP Addendum defines "consensus" as "collective opinion, general accord, agreement. It does not mean complete or total agreement of the group. It is not arrived at by majority vote or dictate of the group leader." AR Tab 6, at 172. At the 2009 SEB's final source

After the 2009 SEB scored each FRP, the 2008 adjectival ratings and numerical scores were compared to the 2009 adjectival ratings and numerical scores and the 2009 SEB was required to explain any differences.  AR Tab 6, at 173.  In doing so, the 2009 SEB was required to maintain a "clear and logical audit trail" to document the rationale for scoring, "by describing the relative advantages and/or disadvantages of the proposal for each [S]ubfactor being reevaluated."  AR Tab 6, at 173.  The 2009 SEB also was charged with providing a summary of findings to the 2009 SSA, including adjectival ratings, numerical scores for each reconsidered factor, and the reconsidered findings.  AR Tab 6, at 174.  Prior Past Performance and Price Factors, as well as the Safety & Health Subfactor, that were not affected by *Wackenhut*, were to be left unchanged, but included in the 2009 SEB presentation to the 2009 SSA.  AR Tab 6, at 174.

## 2.    The Initial Evaluation Of The 2009 Source Evaluation Board.

On January 6, 2009, the 2009 SEB began a re-evaluation of the proposals.  AR Tab 86, at 24990.  On January 20, 2009, however, Mr. James Hattaway, NASA's Associate Director for KSC Business Operations, *sua sponte* sent a memorandum to Sumara Thompson-King, NASA's Chief Counsel for Procurement, recommending that NASA reopen discussions regarding launch and landing staffing at KSC.  AR Tab 118, at 26117-18.  According to Mr. Hattaway, because WSI was the incumbent contractor at KSC, and one of the two members of the SGS Joint Venture, WSI understood the required launch and landing staffing at KSC and used that knowledge in preparing WSI's proposal.  AR Tab 118, at 26118.  CIS did not have this same information.  Accordingly, after receiving the May 20, 2008 initial award, CIS had to adjust its baseline staffing level by adding 46 personnel.  AR Tab 118, at 26118.  Mr. Hattaway estimated that this would add $3.5 to $5.3 million to the cost of the NPS Contract.  AR Tab 118, at 26118.  Quoting from CIS's L&L TO proposal, Mr. Hattaway argued that CIS's proposal "would not work," because it relied on a "flawed methodology[.]"  AR Tab 118, at 26120.  Therefore, Mr. Hattaway urged NASA to inquire why launch and landing staffing at KSC was included in WSI's NPS Contract proposal, but not in CIS's.  AR Tab 118, at 26118.  Without this inquiry, Mr. Hattaway believed that WSI was placed at a price disadvantage, creating a risk for protest.  AR Tab 118, at 26120 ("[the 2009] SEB failure to seek clarification as to why WSI included L&L costs in the basic requirement could be considered a failure to conduct meaningful discussions and could lead to the conclusion that proposals from WSI and CIS were not evaluated equally.").

On January 30, 2009, the 2009 SEB re-evaluation was completed.  AR Tab 86, at 24990.  One of the findings cited WSI for a "significant weakness" in the Technical Approach Subfactor, because of a "significantly inefficient and flawed use of resources at two separate NPSC task orders," *i.e.*, inefficient staffing plans at KSC and the Wallops Flight Facility ("WFF").  AR Tab 86, at 25016-17, 25023.  The 2009 SEB also observed that:

> [WSI's] staffing plan for KSC is substantially inefficient and fails to properly manage resources.  The approach to workload fluctuations is fundamentally flawed because [WSI] has included staffing to support KSC "shuttle launch and recovery operations" in the base proposal contrary to the Government's intent to issue a

---

selection presentation, any dissenting opinions must be documented and provided to the 2009 SSA. AR Tab 6, at 172-74.

separate IDIQ task order for such support.   The resulting overstaffing appears substantial and is a significant weakness that would continue over the entire contract period of performance regardless of the need for launch and landing support.

AR Tab 86, at 25021 (internal citations omitted).[6]

Despite this "significant weakness,"[7] WSI received 340 points out a possible 425 for the Technical Approach Subfactor.  AR Tab 86, at 25024.  In contrast, CIS received 331 points.  AR Tab 86, at 25024.   Both offerors' scores, however, fell within the "very good" range of the adjectival rating scale for the Technical Approach Subfactor.   *Id.*   In addition, both proposals received "very good" ratings for the overall Mission Suitability Factor, with WSI and CIS respectively receiving total scores of 816 and 792.  AR Tab 86, at 25009.

---

[6]  The 2009 SEB also assigned WSI 4 "significant strengths," 2 "strengths," and 1 "weakness."  AR Tab 86, at 25016-17, 25023.  On the other hand, CIS's proposal, received 2 "significant strengths," 4 "strengths," 1 "weakness," and no "significant weaknesses."  AR Tab 86, at 25011, 25014.

[7] The SEP Addendum defined the following:

*Deficiency:* A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful performance to an unacceptable level.  *(Almost fatal to the health of the proposal, one which adversely impacts the score and which must be revealed to the offeror during discussions.   An omission of a RFP requirement is not necessarily a deficiency by itself to be determined by SEB only.)*
*Significant Weakness:* A flaw that appreciably increases the risk of unsuccessful contract performance.  (Will have a severe negative impact upon accomplishment of contract requirements, is below the standard expected, and has a negative impact on the score.)
*Weakness:*  A flaw in the proposal that increases the risk of unsuccessful contract performance.    (Minor  concern,  but  still  has  some  negative  impact  on accomplishment of contract requirements and is below the standard expected.)
*Significant Strength:*  Some aspect of the proposal above the standard expected that greatly enhances the potential for successful contract performance, *or contributes significantly  toward  a  high  level  of  confidence  of  exceeding  the  contract requirement.*
*Strength:* Some aspect of the proposal that will have some positive impact on the successful performance of the contract *and is above the standard expected.*

AR Tab 6, at 176.

### 3.     The Initial Presentation Of The 2009 Source Evaluation Board To The 2009 Source Selection Authority.

On February 9, 2009, the 2009 SEB made an initial presentation to the 2009 SSA to convey the information summarized below:

| Offeror | Mission Suitability Rating/Score | Price | Past Performance Rating |
|---|---|---|---|
| CIS | Very Good 792 | $1.186B | Very Good |
| WSI | Very Good 816 | $1.249B | Very Good |
| NASA Estimate | | $1.210B | |

AR Tab 86, at 25008.

The 2009 SSA, however, declined to issue a source selection decision, because the CO, a member of the 2009 SEB, recommended that discussions be reopened, pursuant to FAR 15.306(d)(3).[8]  The issue was the "significant weakness" for overstaffing at KSC had not been identified in 2008 by the SEB, and was never raised with WSI.  AR Tab 87, at 25098; *see also* AR Tab 103, at 25795 ("If it was not for the fact [WSI] had a big one [weakness] at KSC we would not be talking to anyone.").  The 2009 SEB Chair and NASA Headquarters staff concurred with the CO's recommendation.  AR Tab 87, at 25098.  Accordingly, on February 27, 2009, CIS and WSI were informed that discussions would reopen.  AR Tab 87, at 25098; AR Tab 88, at 25137; AR Tab 89, at 25245.

On March 27, 2009, the court granted the Government's motion to amend *Wackenhut* to extend the deadline for a final decision to July 2009 to allow NASA additional time to issue a reconsidered Source Selection Authority Final Decision.  Order, *Wackenhut Servs. Inc.* v. *United*

---

[8] FAR 15.306(d)(3) provides that:

At a minimum, the contracting officer must, subject to paragraphs (d)(5) and (e) of this section and 15.307(a), indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(3).

*States*, No. 08-660 (Fed. Cl., Mar. 27, 2009).  The court also granted the Government leave to allow NASA to reopen discussions with both offerors, although CIS objected.  *Id.*; *see also* AR Tab 89, at 25270-75.

As NASA began to prepare to reopen discussions, several members of the 2009 SEB expressed confusion about NASA's staffing requirements at KSC.  AR Tab 81, at 24633, 24635.  On March 12, 2009, the 2009 SEB Chair, Ms. Green, sent an e-mail to Mr. Summerfield, a member of the 2009 SEB Management Committee who also served as a KSC-specific advisor to the 2009 SEB, asking whether NASA's staffing estimate for KSC was 421.1 WYEs.  AR Tab 81, at 24633.  The next day, Mr. Summerfield, who subsequently was designated as a KSC-specific "Advisor" to the 2009 SEB, replied that the estimate for KSC should be 334.6 WYEs.  AR Tab 81, at 24635.

On March 31, 2009, NASA entered into an Interim Protective Services Contract ("IPSC") with the SGS Joint Venture to continue providing protective services at KSC from April 1, 2009 to June 31, 2009 that included several one-month options to extend coverage through March 31, 2010.  AR Tab 102, at 25698.[9]

On April 3, 2009, the CO sent a letter to CIS and WSI to advise them that discussions would be reopened, but would be limited only to previously identified "weakness or significant weakness, questions relating to those weaknesses, and pricing changes that directly ensue from technical changes addressing those weaknesses."  AR Tab 88, at 25129; AR Tab 89, at 25211.  CIS and WSI also were advised that, at the end of these discussions, each offeror would be allowed to submit a final proposal revision ("FPR") to address any identified weaknesses.  *Id.*  Technical and price final proposal revisions that did not directly arise from identified weaknesses or were not previously agreed to in writing would not be considered.  AR Tab 88, at 25129-30; AR Tab 89, at 25211-12.  The CO included an attachment listing the "weaknesses" identified by the 2009 SEB in each offeror's proposal.  AR Tab 88, at 25131-32; AR Tab 89, at 25213-14.  The following weaknesses for WSI were identified:

> 1) A significant weakness finding for WSI's overstaffing to support launches and landings at KSC and WFF;
> 2) A less severe weakness for staffing (either overstaffing or understaffing) at several other NASA locations; and
> 3) Failure to provide the required rationale for not meeting or exceeding NASA's recommended subcontracting goals for small businesses.

AR Tab 88, at 25131-32.

The CO also sent a letter to CIS identifying weaknesses in CIS's proposal.  AR Tab 89, at 25211-13.

---

[9] Subsequently, the Government advised the court that NASA had entered interim contracts with other independent contractors to cover all NASA installations through December 2010.  2/26/10 TR at 11:28:00-11:29:10; *see also* AR Tab 100, at 25613.

On April 6, 2009, the 2009 SSA sent an e-mail to Ms. Monica Manning, a Procurement Analyst at NASA Headquarters' Office of Procurement and 2009 SEB Advisor, to inform her that Mr. Hattaway called to ascertain whether the 2009 SEB was going to include launch and landing staffing at KSC as part of the reopened discussions.  AR Tab 103, at 25801.  Ms. Manning forwarded this e-mail to the CO, who replied that he did not believe it was appropriate to discuss this issue with NASA staff who were not members of the 2009 SEB.  AR Tab 103, at 25801.  The CO added that, "[i]f [the SSA] wants to consider Jim Hattaway as part of his advisory team . . . or appoint him in an advisory capacity, and he is merely keeping him informed, that is [the SSA's] call . . . .  If that happens, Jim [Hattaway] needs to understand this is sensitive information not to be revealed thru KSC management."  AR Tab 103, at 25801.  Later that day, the CO advised the 2009 SSA and Ms. Manning:

> Short answer: [launch and landing] is not included in baseline requirements.  Consequently, it will not be directly proposed to in the technical or baseline of the two remaining offers.
>
> In the final proposal revisions (almost a year ago), one company had launch and landing in the baseline, the other had it out!
>
> While I agree the RFP language was a little confusing on this item, after spending a few weeks with SEB 1 members, it appears the intent of the RFP was to have launch and landings as an IDIQ item, and issued as needed.  We found an SEB response to a direct question form [sic] a company about launch and landing, which stated it would be an IDIQ.  To stay consistent, we intend to have it **out**.

AR Tab 103, at 25805.

On April 7, 2009, the CO received an e-mail indicating that WSI had no additional questions regarding the overstaffing "significant weakness" at KSC.  AR Tab 88, at 25175.  On April 8, 2009, the 2009 SEB convened separate teleconferences with each offeror to clarify any of the weaknesses identified in his April 3, 2009 letters.  AR Tab 91 (audio recordings); AR Tab 92, at 25326.  On April 16, 2009, formal discussions concluded.  On April 24, 2009, both offerors submitted FPRs.  AR Tab 88, at 25117; AR Tab 89, at 25205.  In response to the significant weakness finding for overstaffing at KSC, WSI removed 34.95 WYE from its KSC staffing plan.  AR Tab 30, at 6372.  WSI's overall 2009 FPR, as well as the specific proposal for KSC, however, remained more heavily staffed and costly than CIS's approach, as depicted in the following chart:

### April 24, 2009 Final Proposal Revision Comparison

| Offeror | KSC WYE | Total WYE | KSC Task Order Price | Total Contract Price |
|---------|---------|-----------|----------------------|----------------------|
| WSI | 363.85 | 1535.29 | $393 million | $1.216 billion |
| CIS | 301.8 | 1404.85 | $328 million | $1.177 billion |

AR Tab 96, at 25490-97.

### 4.     The Final Evaluation Of The 2009 Source Evaluation Board.

After receiving the FPRs on April 24, 2009, the 2009 SEB conducted a Final Evaluation to determine if any findings should be upgraded, downgraded, or remain unchanged.  AR Tab 95, at 25480.  Concerns about launch and landing staffing at KSC and WSI's revisions regarding the same, however, did not abate.

On May 5, 2009, in response to an inquiry from the 2009 SEB, Mr. Summerfield, now serving as a "subject-matter expert" to the 2009 SEB advised the members that, when compared to current, *i.e.*, J-BOSC[10] workforce levels, WSI's proposal was overstaffed by 33.32 WYE.  AR Tab 81, at 245674, 24677-78.  On May 6, 2009, Ms. Green, the 2009 SEB Chair, responded: "[Q]uite frankly, I am now even more confused . . . if we now have this much specificity in the overstaffing, why, oh why, is this now coming to light?"  AR Tab 81, at 24679.  Ms. Green requested a teleconference with the 2009 SEB, because: "I for one, need someone to explain it to me. The answer quite frankly could impact my position."  AR Tab 81, at 24679.  That same day, Mr. Lloyd Potts, another member of the 2009 SEB, advised the 2009 SEB that WSI's response to the significant weakness rating was "non responsive" and the "Significant Weakness" rating should remain, as originally submitted.  AR Tab 81, at 24674.  Mr. Potts further explained that, although WSI reduced WYE by 34.95, in response to the "Significant Weakness" rating, the overall KSC staffing proposal was only 4 WYEs less than the J-BOSC.  AR Tab 81, at 24674.  Later that day, Mr. Larry Allen, also a member of the 2009 SEB, estimated that WSI's overstaffing was 18 WYE.  AR Tab 81, at 24679.  Mr. Allen stated that he "convinced Mel [Mr. Potts] that this does not reach a level of a significant weakness."  AR Tab 81, at 24679.  In response Ms. Green added: "We need to huddle gentlemen.  We need to honestly relook at our finding and score.  We are now looking at ~6% delta from the ideal state."  AR Tab 119, at 26121.

On May 7, 2009, Mr. Allen advised the other members of the 2009 SEB that:

> I am certainly not understanding why or how [WSI] could magically increase productive hours rather substantially over the present contract.  Frankly, I think it is

---

[10] The 2009 SEB and the parties use the terms "incumbent," "prior," "present," or "current" interchangeably to describe "on the ground" protective services staffing at KSC.  *See, e.g.,* AR Tab 81, at  24674; AR Tab 119, at 26125.  As discussed above, the prior contract was called the Joint Base Operations Support Contract or "J-BOSC."  AR Tab 102, at 25698.  On March 31, 2009, while the NPS Contract was being re-evaluated, the J-BOSC expired and was replaced by an Interim Protective Services Contract ("IPSC").  AR Tab 102, at 25698.  The SGS Joint-Venture, of which WSI was a participant, was the contractor on both the J-BOSC and the IPSC.  AR Tab 102, at 25698.  There does not appear to be any material difference between these two contracts in terms of staffing. The IPSC was designed to maintain the status quo while the NPS Contract was re-evaluated.  AR Tab 102, at 25698.  The staffing estimates used by the 2009 SEB were derived from monthly contractor financial reports submitted under the J-BOSC and the IPSC.  AR Tab 119, at 26126.   The staffing estimate ultimately used by the 2009 SEB was the same as that used during the initial evaluation in January 2009, two months before the IPSC went into effect.  AR Tab 119, at 26126. To eliminate confusion, "incumbent," "prior", "present," or "current" protective services contracts are hereinafter referred to as the "J-BOSC."

smoke and mirrors.  For me the bottom line is that they are still 'overstaffed' . . . to use your words.  The KSC overstaffing/inefficiency is undoubtedly a large part of the cost delta between the Offerors.  I see nothing wrong with pointing this out to the SSA and allowing him to determine what weight or significance it merits.

AR Tab 119, at 26121.

Later that day, Mr. Summerfield responded: "When [Ms. Green] asked me yesterday if the KSC number included NFLET [*i.e.*, trainers] and I said no, I was not thinking about the government estimate.  I mistakenly thought we were back on the assessment numbers we were talking.  I just lost lock on which number we were talking.  The KSC number that we gave the board some time ago <u>does includ[e] NFLET</u>."  AR Tab 119, at 26122 (emphasis in original).

On May 11, 2009, Mr. Summerfield sent another e-mail to the 2009 SEB regarding "analysis of NPSC staffing," observing that WSI's proposal appeared to be overstaffed by 13.22 WYE, primarily because of the KSC issue.  AR Tab 119, at 26123.  In this e-mail, Mr. Summerfield also attached some "additional information" from CIS:

> In order for the Board to better understand the problems we are dealing with I have included some additional information from CIS.  It clearly describes CIS's take on launch and landing and it spells out the additional staffing they propose.  As indicated by CIS, they can't perform launch and landing work without substantial additional staffing that appears to bring them very close to the WSI proposed headcount.

AR Tab 119, at 26123.  This "additional information" was a selected portion of the initial L&L TO proposal that CIS had submitted to NASA, when CIS was the prospective awardee, but prior to the court's decision in *Wackenhut*.  AR Tab 119, at 26123.

On May 13, 2009, the 2009 SSA directed that Mr. Hattaway be appointed as an "advisor" and requested that he attend the upcoming May 21, 2009 briefing by the 2009 SEB.  AR Tab 103, at 25931.

On May 14, 2009, the CO sent an e-mail to Ms. Manning seeking her advice on a draft memorandum to be forwarded to the 2009 SSA:

> KSC [*sic*] been inconsistent on its staffing IGE from our initial meetings in January to as recently as last week, after much angst by the [SEB] and in consideration of the KSC's passion over the issue, we decided [*sic*] keep a KSC weakness and write it at the macro level rather than a direct one for one staffing comparison.

AR Tab 81, at 24696.

The CO's e-mail also concluded that, "because the scores are so close, the issue of shuttle launch and landing so paramount, the passion of the KSC consultant so strong, the interest of KSC management so high," he recommended that a KSC Senior Manager also attend the May 21, 2009

final SSA briefing.  *Id.*  On that same date, the CO sent the 2009 SEB Chair, Ms. Green, an e-mail with documentation to support the changes made by the 2009 SEB the final findings, and reported that: "The WSI KSC weakness rewrite language is reflected in the charts.  I think the deal I made yesterday will be acceptable but I may need to walk you both through my thought process."  AR Tab 119, at 26126-27.

On May 17, 2009, Ms. Green, responded stating: "I am very interested in seeing what, ultimately, KSC provided as support for its staffing analysis.  Asserting % above implies we have a baseline.  Pray tell, what is that[]?"  AR Tab 119, at 26126.

On May 18, 2009, the CO replied:

After looking at the last KSC input which I just sent, I gave up.  If one believes the 13 positions identified, would the new number be 353? . . . I don't think we introduce the CIS staffing information.  We use the WIS [*sic*] incumbent staffing as reflected on the 533 as delivered MYE [*sic*] of approximately 343.

In an effort to bring closure to this I proposed and got an agreement on the weakness you have seen.

We keep the IGE at approximately 343 that we used back in Feb.  If we introduce a new IGE at this stage, I think we must relook at CIS.  Someone is going to ask us why we moved and keep moving.  We just don't have a good answer.  I think we look better if we just stay at approximately 343[.]

If we base the weakness on 343, that is approximately 8%.  We don't write it around individual positions.  We keep it at the bottom line level.  Yes I know that is not how we did the others, but we mention the 13 individual positions and talk the rest about post staffing inefficiencies as an example that is it generally embedded in the [WSI] approach.

So we don't draw to [*sic*] much attention to it, we make it a minor and we add the two other nits we found[.]

AR Tab 119, at 26126.

In return, Ms. Green, replied:

#$@&*%!!   Okay, allow me that, at least.   I cannot reconcile Burt's [Mr. Summerfield's] data with his e-mail the week prior that KSC has not changed its IGE for WYE again.  In fact, his assertion of overstaffing of ~13 is just that.  We are at ~353.  I am troubled by stepping off of our path followed thus far.  Moreover, heretofore, we have evaluated against IGE WYEs.  To introduce what is currently on the ground as well as that which is being reimbursed as our baseline is okay as a

benchmark but want us to talk through the path of not introducing the IGE.  KSC
will have to be accountable for that.

AR Tab 119, at 26125.

Later, that day the CO replied:

Now you understand why I gave up and think it is prudent to default back to our
Feb position of approximately 343, keep it a minor combined with the other nits,
generally compare it to current contract staffing totals, downplay the impact which
will help at debriefing, and let KSC defend questions as they arise.  If Tom think[s]
it is just a minor, we are great shape by calling that.  If KSC convinces him it is
more, then he can say he thinks it is more significant.  If someone asks about CIS
being a weakness, it wasn't a weakness back in FEB [*sic*], and we have not
change[d] from the approximate 343 number we used back then, and we now
understand CIS is actually delivering more hours than WSI.

AR Tab 119, at 26125; *see also* AR Tab 81, at 24633, 24635, 24674, 24677-80; AR Tab 103, at
25795, 25855, 25874-75, 25936 (documenting the 2009 SEB's debate about KSC's staffing
requirements and whether WSI's prior weakness was addressed by WSI).

On May 19, 2009, the CO sent an e-mail to the 2009 SSA advising that the 2009 SEB had
completed an evaluation of the final proposal revisions.  AR Tab 103, at 25936.  Specifically, the
CO advised the 2009 SSA that the point difference between the two offerors' "Mission Suitability"
Factor increased to 30 points, although the price difference decreased to $39 million.  AR Tab 103,
at 25936.  The CO also observed that:

The weakness of any note remains with WIS and it revolves around staffing at
KSC.  While WIS [*sic*] addressed the identified major weakness in the FPR, it was
not corrected to the extent that it was fully eliminated.  During our early discussions
with the KSC technical consultant (Burt Summerfield), he was firm that a major
weakness remained.  After continued dialogue and the SEB challenging his
position, the SEB believes some inefficiencies in the WIS [*sic*] approach remain
and the SEB documented the weakness as a regular weakness.

The KSC weakness remains a key point, although the passion from a few weeks
back has waned.  The KSC task order will be the largest TO under the contract and
KSC is a major stakeholder in the decision.  Based on recent discussions on the
weakness, the SEB is taking a neutral posture on recommending that a senior KSC
manager be in attendance.  We are not recommending for or against it.  As SSA,
you have the right to seek advice and counsel as you see fit. KSC/Burt Summerfield
<u>will</u> be in attendance at the SSA presentation.

AR Tab 103, at 25936.

On May 21, 2009, Ms. Green sent an e-mail to Mr. Robert Lisy, the SEB's Pricing Analyst, asking: "If we were to normalize the calculation of WYEs amongst the parties to that currently in use on the ground at KSC, what would that look like?"  AR Tab 81, at 24665.  Mr. Lisy responded that "[he had] no idea what the current workforce at KSC looks like.  Only the COTR at KSC could give us that information and I wouldn't trust his input on this subject."  AR Tab 81, at 24665.  Mr. Lisy also added that he did not "know how much this would help as the PWS and the current SOW may not be the same."  AR Tab 81, at 24665.  Ms. Green responded: "Actually, what I am suggesting is that we take the current on the ground direct productive work year = WYE and use that to normalize the other two.  We would simply divide the productive hrs by the constant of the on the ground WYE and that would produce normalized sums for WYEs.  Right?"  AR Tab 81, at 24666.  Mr. Lisy replied: "[I]t works out to about 25 WYE more currently on the ground than proposed," but he went on to say that, in his opinion, "a comparison of that nature would be outside of our Section M evaluation criteria.  Also, I don't believe the COTR's productive hour information."  AR Tab 81, at 24665.

Ms. Green queried: "25 more on the ground currently?  Huh?  I would expect the opposite.  Our section M says we are going to eval agst [*sic*] IGE yet as you know we are using benchmark on the ground."  AR Tab 81, at 24668.  In addition, she asked: "[w]hat are the WSI and CIS productive work years for Security Officers?"  AR Tab 81, at 24668.  Mr. Lisy answered that CIS had 1793 productive work years and WSI had 1760.  AR Tab 81, at 24668.

On May 27, 2009, the day before the 2009 SEB was to make a final presentation to the 2009 SSA, Mr. Hattaway, NASA's Associate Director for KSC Business Operations, sent an e-mail to Mr. Summerfield, in his new capacity as a 2009 SEB Advisor, stating that:

> CIS did not understand magnitude of L/L effort at KSC once [they] did they realized their technical approach, using part time workers, would not work.

> CIS states they proposed on the baseline staffing and L/L as discreet [*sic*] staffing exercises and this methodology is flawed.

> CIS has placed NASA on notice that they must add 46 people to baseline proposal in order to have a workable technical approach.
> 46 people cost ~$4.5M annually[.]

> If CIS proposal [*sic*] accepted as it currently is, KSC will be required to rebaseline the contract immediately after award to add the 46 people CIS has put us on notice they require.  Failure to do this results in a contract that is unexecutable.

> Failing to address the known deficiency in CIS's proposed baseline staffing gives them an unfair competitive advantage equal to at least $4.5M annually over the life of the contract.

> WSI included L/L costs and staffing in their proposal and we told them to remove them.

Why do we ignore the fact that CIS states that their staffing methodology was flawed and they require an additional 46 people in their baseline staffing.

Accepting the CIS proposal as is when we are on notice that the baseline staffing must be adjusted to add 46 additional personnel is not fair to WSI.

AR Tab 118, at 26115.

Mr. Summerfield responded:

Our issue is about competitive fairness, not launch landing[.]

In this procurement, NASA has been informed by one offeror [that their] proposed approach will not work and no action has been taken to address this fact.

The [problem] with the CIS approach they are requiring a baseline adjustment because their own assessment is that this mechanism is the only practical cost effective approach to [allowing] them to get into a posture to support launch and landing.

Not addressing the issue engenders significant risk and any decision should be made understanding this risk.

AR Tab 118, at 26115.

### 5.    The Final Presentation Of The 2009 Source Evaluation Board To The 2009 Source Selection Authority.

On May 28, 2009, the 2009 SEB made a second and final presentation to the 2009 SSA. AR Tab 95, at 25480; AR Tab 97, at 25498.  On this occasion, the 2009 SEB reported that CIS adequately addressed the prior "weakness" under the Technical Approach Subfactor, however, the other findings remained unchanged.  AR Tab 95, at 25480.  As a result, CIS's final score was increased by 2 percentage points to 80%, *i.e.*, the middle of the "Very Good" range.  AR Tab 95, at 25480-81.  As for WSI's revised proposal, the 2009 SEB reported that WSI adequately addressed the "significant weakness" related to WFF, but:

[T]he response was still considered to contain an inefficient use of resources at KSC. After extended discussions over a 3 week period supported by the KSC consultants, the [2009 SEB Voting Members] were in agreement that WSI did not adequately address the significant weakness.  The information available continued to support a staffing issue at KSC that constituted a weakness but not to the degree of the significant weakness.  The significant weakness was downgraded to a regular weakness.  The summary findings document would be revised to reflect the fact that the weakness still existed.

AR Tab 95, at 25481.

24

The 2009 SEB also found that WSI addressed two prior technical "weaknesses," but remained concerned about the requirements at the Michoud Assembly Facility ("MAF") and the Marshall Space Flight Center ("MSFC").  AR Tab 95, at 25481.  This "weakness," however, "was of much less weight than the initial weakness."  AR Tab 95, at 25481.  In sum, "two weaknesses" remained in WSI's proposal.  AR Tab 95, at 25481.  Nevertheless, the 2009 SEB found that WSI's amended Final Proposal Revisions were in the "upper range" of "Very Good," and increased WSI's percentile score in the Technical Approach Subfactor by 5 percentage points to 85%.  AR Tab 95, at 25481.  This increase was primarily attributable to the reduction of the "significant weakness" to a "regular weakness."  AR Tab 95, at 25481.

The 2009 SEB made no changes to the prior scores of either offeror or the adjectival ratings for the Management Approach Subfactor.  AR Tab 95, at 25483.  In addition, both the offerors eliminated their prior "weaknesses" in the Small Business Participation Subfactor, with CIS and WSI receiving "very good" and "good" ratings respectively.  AR Tab 95, at 25484-85.

To summarize, the 2009 SEB made the following Final Findings for the Mission Suitability Factor:

### Summary of The 2009 Source Evaluation Board's
### Final Findings for the Mission Suitability Factor

| Subfactor | CIS | | | | WSI | | |
|---|---|---|---|---|---|---|---|
| | SEB 08 | SEB 09-1 | SEB 09-2 | | SEB 08 | SEB 09-1 | SEB 09-2 |
| Technical Approach | E 91% 387 | VG 78% 331 | VG 80% 340 | | E 93% 395 | VG 80% 340 | VG 85% 361 |
| Management Approach | VG 90% 338 | VG 83% 311 | VG 83% 311 | | E 95% 356 | VG 87% 326 | VG 87% 326 |
| Small Business | G 70% 70 | G 65% 65 | VG 75% 75 | | G 65% 65 | G 65% 65 | G 69% 69 |
| Health & Safety | VG 85% 85 | VG 85% 85 | VG 85% 85 | | VG 85% 85 | VG 85% 85 | VG 85% 85 |
| Total | 880 | 792 | 811 | | 901 | 816 | 841 |

AR Tab 95, at 25485.

Accordingly, the 2009 SEB reported the following overall Final Findings to the 2009 SSA:

**Summary of The 2009 Source Evaluation Board's Final Findings**

| Offeror | Mission Suitability Rating/Score | Price | Past Performance Rating |
|---|---|---|---|
| **CIS** | Very Good 811 | $1.178B | Very Good |
| **WSI** | Very Good 841 | $1.216B | Very Good |
| **Government Estimate** | | $1.202B | |

AR Tab 97, at 25511.

Neither the 2009 SEB's Final Findings nor the May 28, 2009 presentation to the SSA contained any dissenting opinions.  AR Tab 95, at 25480-85; AR Tab 97, at 25498-559.

**6.    The 2009 Source Selection Authority's Source Selection Statement  And Contract Award.**

On June 18, 2009, the 2009 SSA issued a Source Selection Statement that awarded WSI the NPS Contract.  AR Tab 98, at 25560-73.  In making this award, the 2009 SSA rejected the 2009 SEB finding of two "weaknesses" in WSI's proposal for the Technical Approach Subfactor.  AR Tab 98, at 25565-66.  Specifically, as to the "weakness" finding for overstaffing at MAF and MSFC, the 2009 SSA stated, "I viewed these issues solely as a matter of staffing and did not believe these issues indicated [WSI] did not understand the requirements at MSFC or MAF."  AR Tab 98, at 25566.  The 2009 SSA then concluded that these issues were not significant and were "readily correctable."  AR Tab 98, at 25566.  The 2009 SSA also was not concerned about the 2009 SEB's finding of a "weakness" in WSI's KSC staffing plan, because:

The consensus of the [2009] SEB was that [WSI] did not fully demonstrate an understanding of the requirement in the KSC task order (TO) because its proposed staffing reflected an inefficient approach to the KSC TO and a misunderstanding of the requirement at KSC.  I believed this weakness might reflect an approach which allowed [WSI] to respond to both basic contract requirements *and future TOs*.  I concluded that [WSI's] proposed staffing represented a legitimate business approach to the requirements and determined any inefficiencies associated with this approach would be reflected in the Pricing factor.  For these reasons, I did not agree with the [2009] SEB's statement that [WSI's] staffing was "an inefficient approach to the KSC TO and a misunderstanding of the requirement at KSC."  Consequently, I characterized this weakness in a similar manner as the staffing issues at MSFC

and MAF, concluding neither weakness was of sufficient importance to influence my assessment of the merits of [WSI's] Technical Approach.

AR Tab 98, at 25566 (emphasis added).

As for the comparative assessment of the proposals to the non-price Factors and Subfactors, the 2009 SSA acknowledged that NASA FAR Supplement 1815.370(h)(2)[11] requires that discriminators be based on significant strengths and weaknesses, with regular strengths and weaknesses used as "backup material," but he explained that because of closeness of evaluations, he looked at all findings in evaluating the proposals "to better distinguish between [them]."  AR Tab 98, at 25565, 68.

Within the Mission Suitability Factor, the 2009 SSA generally agreed with the 2009 SEB Technical Approach Subfactor finding, "except for the weaknesses [] identified for [WSI] regarding staffing concerns at MSFC, MAF, and KSC."  AR Tab 98, at 25569.  The 2009 SSA, reiterated that, "*the staffing at KSC did not influence my opinion regarding the technical merits of* [*WSI's*] *proposal*[,] *because I believed* [*WSI's*] *proposed approach was an acceptable way to staff KSC's requirements.*  Similarly, I did not give much weight to the weakness regarding MSFC and MAF."  AR Tab 98, at 25569 (emphasis added).  Accordingly, the 2009 SSA concluded that WSI had a superior Technical Approach.  AR Tab 98, at 25569.  He further observed that: "the differences between the proposals were larger than it appeared in the [2009] SEB findings[,] because I did not place importance on the weaknesses [that the 2009] SEB gave [WSI] due to staffing problems at KSC, MSFC, and MAF."  AR Tab 98, at 25569.

Regarding the Management Approach Subfactor, the 2009 SSA concluded that WSI's proposal was slightly superior and concurred with the 2009 SEB that the offerors' "significant" and "regular strengths" counterbalanced each other and there were "no discriminators" between the two proposals.  AR Tab 98, at 25570-71.  The 2009 SSA also agreed that WSI's proposal warranted a slightly higher score for "nuances" in WSI's proposal for staff compensation plan and training program for fire personnel.  AR Tab 98, at 25570-71.

The 2009 SSA also discerned "no discriminators" under the Small Business Approach Subfactor.  AR Tab 98, at 25571.  The 2009 SEB rated CIS's Small Business Approach as "very good," whereas WSI's was rated "good," but the 2009 SSA decided this difference was "primarily due to the fact that [CIS] greatly exceeded the goals in two sub-categories of small business."  AR Tab 98, at 25571.  In addition, he weighed WSI's past performance in meeting small business goals against the "significant strengths" that CIS received for the Small Business Approach.  AR Tab 98, at 25571-72.  Based on this comparison, the 2009 SSA concluded that: "the differences in the subfactor for Small Business were not meaningful for purposes of selection."  AR Tab 98, at 25572.  Likewise, in the Health & Safety Subfactor, the proposals were deemed "equally effective."  AR Tab 98, at 25572.

---

[11] NASA FAR 1815.370(h)(2) provides: "The presentation [to the SSA] shall focus on the significant strengths, deficiencies, and significant weaknesses found in the proposals, the probable cost of each proposal, and any significant issues and problems identified by the SEB."

As for the Past Performance Factor, the 2009 SSA rated WSI as "slightly superior." AR Tab 98, at 25572. Although WSI and CIS received "very good" ratings, the 2009 SSA was impressed with WSI's strengths in Past Performance for high quality service and meeting small business goals, and found that this strength provided "a meaningful difference that distinguished the Offerors with regard to Past Performance [that] favored [WSI]." AR Tab 98, at 25572.

Regarding price, the 2009 SSA acknowledged that CIS had a slightly lower price. AR Tab 98, at 25572. But, he explained that most of the price difference was in the basic contract and, in the option years, the price proposals were almost identical. AR Tab 98, at 25572. The 2009 SSA also concluded that WSI's "higher price was primarily due to its approach to performing services at KSC." AR Tab 98, at 25572.

With each of these factors in mind, the 2009 SSA described his tradeoff analysis as primarily comparing CIS's lower price against WSI's "superior proposal relative to Mission Suitability and slightly better Past Performance." AR Tab 98, at 25572. He also emphasized the importance of performance, because the NPS Contract is a services contract. AR Tab 98, at 25572-73. Although the 2009 SSA recognized that price becomes increasingly important as non-price factors are closer among offerors, he "believed that the order of importance in the [S]olicitation was appropriate in an Indefinite Delivery/Indefinite Quantity contract such as the [NPS Contract] where the actual costs of performance would not be known until the completion of the contract." AR Tab 98, at 25573. Accordingly, the 2009 SSA determined that "differences in Mission Suitability and Past Performance [factors] warranted paying a slightly higher price." AR Tab 98, at 25573. For these reasons, on June 18, 2009, the 2009 SSA selected WSI for award of the NPS Contract. AR Tab 98, at 25573.

## III.   PROCEDURAL HISTORY.

### A.   Before The United States Government Accountability Office.

On July 2, 2009, CIS filed a bid protest with the United States Government Accountability Office ("GAO"), alleging that the SSA's "best value" determination was unreasonable, the selection of WSI was inconsistent with applicable procurement laws, and that the SSA's Source Selection Statement was not adequately documented. AR Tab 1, at 1-28. On September 24, 2009, the GAO denied that protest. *See Costal International Security, Inc.*, B-400240.3, B-400240.4, B-400240.5, 2009 CPD ¶ 196, 2009 WL 3194264 (Comp. Gen. Sept. 24, 2009).

### B.   Before The United States Court Of Federal Claims.

On October 6, 2009, CIS filed a post-award bid protest Complaint for Declaratory and Injunctive Relief ("Compl.") in the United States Court of Federal Claims, together with a Motion To Seal, Motion For Temporary Restraining Order, and Motion For Preliminary Injunction. The Complaint was assigned to the undersigned judge and the court convened a telephone status conference with the parties on that date. During that conference, CIS requested that evidence submitted to the GAO and the transcript of GAO proceedings be included in the Administrative Record. The court directed the parties to confer as to the content of the Administrative Record in light of the United States Court of Appeals for the Federal Circuit's holding in *Axiom Res. Mgmt, Inc.* v. *United States*, 564 F.3d 1374, 1379-81 (Fed. Cir. 2009) (limiting review to the record

"actually before the agency," unless the court determines that "the omission of extra-record evidence precludes effective judicial review").

On October 7, 2009, the court denied CIS's Motion For Temporary Restraining Order, because the Government represented that work under the NPS Contract would not commence until this protest was adjudicated.  For this reason, the court also deferred ruling on CIS's Motion For Preliminary Injunction.  The court, however, granted CIS's Motion To Seal and WSI's oral Motion To Intervene.

On October 9, 2009, the parties filed a Joint Status Report, representing that the parties conferred as to the content of the Administrative Record, but could not come to an agreement.  The Government was willing to add any documents that were introduced during the GAO proceedings, including the hearing transcript and filings by the parties, but reserved the right to object on grounds of relevance.  CIS asserted that these documents properly are part of the Administrative Record, pursuant to RCFC Appendix C § 22(u), and may be relied upon in reviewing the agency's decision.  WSI countered that the GAO hearing transcript, legal briefs of the parties submitted to GAO, and declarations/affidavits of CIS's employees submitted to GAO may not be included in the Administrative Record, pursuant to *Axiom.*

On October 16, 2009, CIS filed a Motion To Consider Evidence That Was Before The GAO and a Motion To Compel the depositions of three NASA employees relating to evidence adduced before GAO.  On October 20, 2009, the court ordered the Government to file the Administrative Record, excluding the transcript, briefs, or other documents that were part of the GAO proceeding.

On October 21, 2009, the court denied CIS's Motion To Compel, as premature, since the court first must review the Administrative Record filed by the Government, before it can consider whether supplementation is required.  *See Axiom Res. Mgmt,* 564 F.3d at 1381 ("The focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA.").  That same day, the Government filed the Administrative Record, pursuant to the court's October 20, 2009 Order.

On October 30, 2009, the court stayed Counts I and II of CIS's October 6, 2009 Complaint, pending the court's review of the Administrative Record and resolution of dispositive motions as to the October 6, 2009 Complaint's remaining counts.  Counts I and II also were stayed, because the Government represented that the NASA Office of Inspector General was investigating matters related to Counts I and II of the Complaint.  The court subsequently has determined that supplementation of the Administrative Record is not necessary to permit "effective judicial review" of Counts III-VI.  *See Axiom Res. Mgmt.,* 564 F.3d at 1381; 4/20/2010 TR 73:7-23; *see also* 4/20/2010 TR 77:14-20 (Plaintiff's counsel conceding that supplementation is not required to resolve Counts III-VI).

Nevertheless, on November 4, 2009, CIS filed a Motion To Require The Government To File a Complete, Fair, And Accurate Administrative Record, specifically to supplement the Administrative Record with the entire L&L TO proposal that CIS submitted to NASA in the fall and winter of 2008, when CIS was the prospective awardee.  After receiving responses and replies,

the court also denied this motion on December 7, 2009, because the portions of the L&L TO proposal actually reviewed by the 2009 SEB Voting Members and the SSA were already included in the Administrative Record.

On November 16, 2009, CIS filed a Motion For Judgment On The Administrative Record On Counts III-VI Of The Complaint ("Pl. Mot."). On December 4, 2009, the Government filed a Cross-Motion For Judgment On The Administrative Record ("Gov't Cross Mot."). On that same date, WSI filed a Cross‐Motion For Judgment On The Administrative Record On Counts III-VI Of The Complaint ("WSI Cross Mot."). On December 14, 2009, CIS filed a response to both Cross-Motions ("Pl. Resp."). On December 22, 2009, the Government filed a Reply ("Gov't Reply"). On that date, Defendant-Intervenor WSI also filed a Reply ("WSI Reply").

On April 15, 2010, the court convened a telephone conference to discuss receipt of an anonymous *ex parte* letter, dated April 14, 2010 nominally from NASA, that was placed under seal and forwarded to the parties.[12]

On April 20, 2010, the court heard oral argument on the parties' Cross-Motions For Judgment On The Administrative Record. 4/20/10 TR 6-73. Before the argument commenced, however, Mr. David Nasse, a law clerk for the court, made a statement on the record to report that on April 19, 2010, he received an anonymous telephone call from a man who represented that he was from NASA Inspector General's Office. When he was asked whether he wanted to speak directly with the undersigned judge, the caller hung up and did not call back. *Id*. at 4-5. The caller never provided his name. *Id.*

On May 3, 2010, WSI submitted a Post-Hearing Supplemental Brief ("WSI Supp. Br."). On May 6, 2010, CIS filed a Closing Brief On Counts III-VI ("Pl. Cl. Br.").

## IV.    JURISDICTION.

### A.    Jurisdiction.

Pursuant to 28 U.S.C. § 1491(b)(1) (2006), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L No. 104-320, § 12(a)-(b) 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by
> a Federal agency for bids or proposals for a proposed contract or to a proposed

---

[12] During this telephone conference, the Government informed the court that the NASA Office of Inspector General had closed the investigation referenced in the court's October 30, 2009 Order; however, the Government was in communication with the United States Attorney's Office for the District of Columbia and was aware of an on-going criminal investigation related to this matter.

award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

The October 6, 2009 Complaint alleges that NASA violated: 41 U.S.C. § 253b(d)(3); FAR 15.303, FAR 15.305; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by awarding the NPS contract to WSI. Compl. Accordingly, the October 6, 2009 Complaint recites a sufficient basis for the court to exercise jurisdiction.

**B.      Standing.**

**1.      Plaintiff's Standing.**

**a.      Governing Precedent.**

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs.* v. *United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes). A two-part test is applied to determine whether a protester is an "interested party:" (1) the protestor must show that it was an actual or prospective bidder; and (2) the protester must have a direct economic interest in the procurement. *See Distrib. Solutions, Inc.* v. *United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008) ("To qualify as an 'interested party,' a protestor must establish that: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement. (citations omitted).

In addition to establishing "interested party" status, a protestor must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc.* v. *United States*, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009) ("It is basic that 'because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378.

**b.      The Court's Resolution.**

In this case, CIS submitted a timely proposal in response to the September 14, 2007 Solicitation and on June 18, 2009 was awarded the NPS Contract. *See Wackenhut,* 85 Fed. Cl. at 285. Therefore, the 2009 SSA's subsequent decision to award the NPS Contract to WSI directly affects CIS's economic interests. AR Tab 98, at 25564-74. Accordingly, CIS is an interested party within the meaning of 28 U.S.C. 1491(b)(1). In terms of establishing the requisite prejudice,

the September 14, 2007 Solicitation was a "competitive negotiated acquisition" to be awarded to the "responsible Offeror whose proposal represents the best value after evaluation in accordance with the factors and subfactors in the solicitation." AR Tab 63, at 17256. CIS and WSI were the only firms ultimately determined to be in the "competitive range." AR Tab 63, at 17256. In addition, the Administrative Record indicates that the competition between the two proposals was very close. AR Tab 81, at 24696. Therefore, CIS plainly had a substantial chance of being awarded the NPS Contract. *See Labatt*, 577 F.3d at 1378. Because CIS has established that it is an "interested party" and had a "substantial chance" of being awarded the NPS Contract, the court has determined that CIS has standing to pursue this bid protest. *See Myers*, 275 F.3d at 1370 ("To have standing, the plaintiff *need only establish* that it 'could compete for the contract' if the bid process were made competitive.") (emphasis added) (internal citations omitted).

### 2. The Defendant-Intervenor's Standing.

#### a. Governing Precedent.

Rule 24(a)(2) of the United States Court of Federal Claims provides, in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . claims an *interest relating to the property or transaction that is the subject of the action*, and is so situated that the *disposition of the action may* as a practical matter *impair or impede the movant's ability to protect its interest*, unless existing parties adequately represent that interest.

RCFC 24(a)(2) (emphasis added).

Our appellate court has advised that "the requirements for intervention are to be construed in favor of intervention[.]" *Am. Mar. Transp., Inc.* v. *United States,* 870 F.2d 1559, 1561 (Fed. Cir. 1989).

#### b. The Court's Resolution.

In this case, WSI moved to intervene at the October 6, 2009 initial status conference, the same day CIS filed the Complaint. Therefore, WSI has established "an interest relating to the . . . transaction that is the subject of [this] action," RCFC 24(a)(2), because WSI's proposal was determined to be in the "competitive range." AR Tab 77, at 23253. No other party can adequately represent WSI's interests. As a rival for the NPS Contract, CIS cannot do so. Nor can the Government, as it has the responsibility to represent only NASA's interests.

In addition to satisfying the jurisdictional requirements for standing, no party opposed WSI's motion and the court is unaware of any prejudice to the existing parties or unusual circumstances that would require WSI to be denied full intervention rights. *See* RCFC 24(a). For these reasons, on October 7, 2009, the court granted WSI's Motion To Intervene.

## V.     APPLICABLE STANDARDS OF REVIEW.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am. Inc.* v. *United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted); *see also Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (same).

When a bid protest is based on regulatory or procedural violation, *i.e.*, "not in accordance with law," our appellate court also has imposed an additional requirement that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.*, 564 F.3d at 1381 (internal quotations and citations omitted).  This burden is even greater when the procurement is a "best value" procurement, as is the case here.  *See Galen Med. Assocs.*, 369 F.3d at 1330 ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also Unisys Corp.* v. *Widnall*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

If an award decision is challenged, because it was made without a rational basis, the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech Group, Inc.* v. *United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also Savantage Fin. Servs.* v. *United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) ("We must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal alterations, quotations and citations omitted); *Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke[] highly deferential rational basis review . . . [u]nder that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotations and citations omitted).

In the alternative, if an award decision is challenged, because the agency acted in an arbitrary or capricious manner, the court may interfere "only in extremely limited circumstances." *United States* v. *John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed. Cir. 1983).  "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus. Inc.-Birmingham* v. *United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (*quoting Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In this case, the parties have filed cross-motions for Judgment on the Administrative Record, pursuant to RCFC 52.1, requiring the court to conduct a proceeding akin to an expedited trial on the record. *See* RCFC 52.1, Rules Committee Note (July 13, 2009); *see also Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."); *A & D Fire Prot. Inc.* v. *United States*, 72 Fed. Cl. 126, 131 (2006) ("The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record."). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum*, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC [52.1][13] from the [limited] record evidence as if it were conducting a trial on the record").

## VI. DISCUSSION.

CIS's October 6, 2009 Complaint contains six Counts. Count I alleges that Mr. James Hattaway, NASA's Associate Director for KSC Business Operations, improperly influenced the 2009 SSA's Award Decision through a series of improper and *ex parte* communications in violation of FAR 1.102-2(c) and FAR 1.602-2. Compl. ¶¶ 133-56. Count II alleges that Mr. Hattaway also made false statements to the 2009 SSA about CIS's past performance in violation of FAR 15.306(d)(3). *Id*. at ¶¶ 157-62. CIS alleges that it only became aware of the underlying facts of Counts I and II in connection with an August 25, 2009 GAO hearing in *Coastal Int'l Security, Inc.*, B-400240.3. *Id*. at ¶¶ 27, 139, 163-66. Because a meaningful judicial review of the claims alleged in Counts I and II will require the court to review evidence adduced at the GAO hearing, the court stayed proceedings as to Counts I and II, pending the resolution of portions of Count III,[14] and the entirety of Counts IV-VI adjudicated herein. Order, *Coastal Int'l Security, Inc.* 09-667 (Fed. Cl. Oct. 30, 2009) (citing *Axiom Res. Mgmt.*, 564 F.3d at 1379-81).

---

[13] RCFC 56.1 "Review of a Decision on the Basis of the Administrative Record" was repealed and replaced with RCFC 52.1 during the 2006 Revision of the Rules, in part because of the holding *Bannum* documenting the confusion between Summary Judgment standards (RCFC 56) and the now repealed RCFC 56.1. *See* RCFC 52.1 2006 Rules Committee Notes. RCFC 52.1 was adopted to conform to the United States Court of Appeals for the Federal Circuit's holding in *Bannum*. *Id*.

[14] After entry of the October 30, 2009 Order, the court became aware that certain paragraphs of Count III also included allegations that relate to Counts I and II. Compl. ¶¶ 177-78, 182. Accordingly, those allegations are not adjudicated herein. Order, *Coastal Int'l Security, Inc.* 09-667 (Fed. Cl. Oct. 30, 2009) (citing *Axiom Res. Mgmt.*, 564 F.3d at 1379-81).

A. **Count III - Whether 41 U.S.C. § 2635(d)(3), FAR 15.303, and FAR 15.305 Were Violated By The 2009 Source Selection Board And The 2009 Source Selection Authority's Consideration Of Future Task Orders For Launch And Landing Staffing At The Kennedy Space Flight Center.**

1. **Allegations In Count III Regarding The 2009 Source Selection Board.**

Count III alleges, in relevant part, that the 2009 SEB failed to follow the terms of the Solicitation by improperly considering launch and landing staffing at KSC in its "analysis," in violation of 41 U.S.C. § 2536(d)(3), FAR 15.303, and FAR 15.305, and thereby prejudiced CIS. Compl. at ¶ 174; *see also id.* at ¶¶ 167-76.

a. **Parties' Arguments.**

i. **The Plaintiff's Motion.**

The Solicitation advised all offerors that launch and landing services at KSC "will be priced and implemented as a separate ID/IQ Task Order." AR Tab 64, at 17889. Because launch and landing staffing at KSC was not part of the Solicitation, discussions among NASA staff regarding this additional work in the context of the award of the NPS Contract violated 41 U.S.C. § 253b(d)(3), as well as FAR 15.303 and FAR 15.305. Pl. Mot. at 24-25.

Specifically, Mr. Hattaway sent a January 20, 2009 e-mail to NASA's Chief Procurement Counsel that misrepresented CIS's L&L TO proposal and failed to mention that CIS's initial L&L TO proposal was revised. *Id.* at 25 n.6. A May 11, 2009 e-mail from Mr. Hattaway to Mr. Summerfield, a KSC employee-member of the 2009 SEB Management Committee and 2009 SEB Advisor, also incorrectly stated that CIS could not perform the launch and landing work at KSC "without substantial additional staffing that appears to bring them very close to WSI['s] proposed headcount." AR Tab 119, at 26123. In turn, Mr. Summerfield improperly circulated selected portions of CIS's initial L&L TO proposal, thereby improperly introducing launch and landing at KSC into the 2009 SEB's discussions. Moreover, his gratuitous observations were "highly misleading," as they failed to recognize that CIS's revised L&L TO proposal utilized 50% fewer personnel. Pl. Mot. at 25-26. Mr. Summerfield also failed to mention that WSI's proposal called for an additional 35 WYE to support launch and landings. *Id.* Therefore, any comparison between CIS's specific L&L TO proposal and WSI's NPS Contract proposal was improper and prejudiced CIS. *Id.*

As a result of these communications, the CO advised the 2009 SSA that the issue of launch and landing at KSC was "paramount" and had been the cause of significant "angst" among the 2009 SEB Members. *Id.* at 26. On May 27, 2009, the day before the 2009 SEB's final presentation to the 2009 SSA, Mr. Hattaway and Mr. Summerfield exchanged e-mails "discussing how they could use [CIS's] first [L&L TO] proposal to influence the [2009] SSA and other participants at the final briefing." *Id.* at 27. Launch and landing staffing at KSC, however, never should have even been part of the evaluation, much less "paramount" to the 2009 re-evaluation. *Id.*

### ii.     The Government's Cross-Motion.

The Government counters that the 2009 SEB did not consider launch and landing staffing at KSC as a requirement of the Solicitation, because this work, if it was authorized, was to be priced and implemented as a stand-alone task order.  Gov't Cross Mot. at 22.  Even if they did, it was not improper for NASA staff to engage in such discussions with the 2009 SEB, since "the issue of shuttle launch and landing [was] so paramount" to KSC's mission.  AR Tab 81, at 24696.  In any event, Mr. Hattaway's e-mails do not establish that the 2009 SEB treated launch and landing staffing at KSC as a Solicitation requirement, only that Mr. Hattaway urged the 2009 SEB to consider doing so.[15]  Gov't Cross Mot. at 24.

It is important to recognize that WSI considered launch staffing at KSC as part of the "day-to-day baseline effort" of "Launch Operations."  AR Tab 64, 17889.  For this reason, WSI included "excessive baseline staffing to cover Shuttle launch and landings" even though it was "contrary to [NASA's] stated strategy to plan and buy launch services only as required."  AR Tab 93, at 25366 (emphasis omitted).  As a result, WSI's initial proposed baseline staffing was found by the 2009 SEB to be a "significant weakness."  AR Tab 86, at 25021 (emphasis omitted).  WSI's 2009 Final Proposed Revisions, however, decreased launch and landing support by 34.95 WYE and pledged to use ID/IQ task orders in each contract year to address launch operations.  Gov't Cross Mot. at 25.   As a result, the 2009 SEB properly changed WSI's "significant weakness" to a "regular weakness," but the 2009 SEB continued to register concerns that WSI included excess staffing throughout the plan.  AR Tab 93, at 25368.

### iii.     The Defendant-Intervenor's Cross-Motion.

WSI emphasizes that discussions were reopened specifically to allow WSI to reduce the number of launch and landing staff at KSC from WSI's initial proposal, and WSI did so.  WSI Cross Mot. at 24.  From that point forward, the 2009 SEB's evaluation focused only on baseline staffing.  *Id.* at 25.  The fundamental flaw in CIS's argument is a continued failure to recognize the interrelationship between "baseline staffing that is sufficient to provide a base for launches and landings personnel, on the one hand, and launches and landings staffing, on the other."  *Id.*

> Where baseline staffing is too high, there is a concern that KSC will pay for personnel that are not really needed until a "surge" occurs in the context of a launch.  Conversely, if baseline staffing is too low, there is a concern that there will not be a sufficient infrastructure of knowledgeable personnel to be able to support [a] surge of personnel who are familiar with KSC's operations.

*Id.*

Mr. Hattaway's January 20, 2009 e-mail accurately indicates that CIS did not propose a sufficient number of baseline personnel and would need 46 more "*baseline personnel* (not launch

---

[15] Even if Mr. Hattaway did act improperly, his alleged misconduct is not at issue at this juncture, in light of the stay of Counts I and II of CIS's October 6, 2009 Complaint.  Gov't Cross Mot. at 24.

and landings personnel)" in order to be prepared for any future launch event. *Id*. (emphasis in original). This is consistent with CIS's statement that it used a "flawed [staffing] methodology." AR Tab 118, at 26120. In other words, even if CIS submitted a second staffing proposal with 50% fewer personnel, CIS still would have underestimated baseline staffing by at least 23 WYE. WSI's Cross Mot. at 25 n.6.

In any event, there is no evidence in the Administrative Record that Mr. Hattaway's January 20, 2009 e-mail was forwarded, received, or even considered by the 2009 SEB. *Id*. at 26-27, 34. Instead, the Administrative Record evidences that this issue was only discussed by two NASA employees, neither of whom was a voting member of the 2009 SEB. *Id*. What is known is that CIS was never assigned a weakness for baseline understaffing. *Id.* at 27-28. Accordingly, CIS could not have been, and was not, prejudiced by Mr. Hattaway's e-mails. *Id.*

### iv.     The Plaintiff's Response.

CIS responds that the Government and WSI inappropriately "weave[d] security for launch and landings into the acquisition by contending that the 'day-to-day baseline effort' at KSC included a base for launch and landing personnel," without citing any authority in the Solicitation. Pl. Resp. at 3.

WSI insists that there is a "tripartite distinction among: (i) security for day-to-day operations; (ii) security sufficient to provide a so-called base for launch and landing personnel; and (iii) added security for launch and landing." *Id.* at 7. The Solicitation, however, contains no such distinction, as it expressly excludes launch and landing support at KSC. *Id*. Moreover, when CIS asked for clarification about this issue, NASA responded that "[s]urges for launches shall be determined by ID/IQ in the beginning of the contract start and shall be used for each mission." AR Tab 69, at 18976. In light of this response, "the only reasonable interpretation of the KSC baseline staffing requirement in the RFP is one that did not include baseline support for launches and landings." Pl. Resp. at 8. Since the 2009 SEB considered "baseline staffing" to include launch and landing staffing at KSC, this interpretation of the Solicitation was arbitrary and capricious. *Id*.

Moreover, the "flawed methodology" referred to in CIS's December 2, 2008 L&L TO proposal is not relevant to the 2009 award decision, as it simply describes CIS's view that NASA's decision to make launch and landing staffing at KSC a separate task order requirement was inefficient. AR Tab 118, at 26120.

The Government's and WSI's argument that launch and landing staffing at KSC was not a predominant or even a significant factor in the procurement is belied by the CO's May 14, 2009 e-mail to the 2009 SSA, describing launch and landing staffing at KSC as a "paramount" issue. *Id.* at 13. If launch and landing staffing at KSC was not an important issue, then why was there so much debate about the issue among members of the 2009 SEB? *Id.* Although WSI tried to minimize the CO's observation as a "draft," in fact, this statement was contained in an e-mail to Ms. Monica Manning, an SEB Advisor and Procurement Analyst, who worked directly under the SSA. *Id.* at 14.

### v.     The Government's Reply.

The Government replies that launch and landing operations at KSC were expressly included in the Solicitation as part of day-to-day "baseline staffing." Gov't Reply at 3 (citing AR Tab 64, at 17889). Amendment 5 to the Solicitation provides that, "[s]urges for launches shall be determined by ID/IQ in the beginning of the contract start and shall be used for each launch." AR Tab 69, at 18976. Although there is no definition of "surge" in the Solicitation, the plain language of the term suggests that NASA intended ID/IQ task orders only to cover surges, not the entirety of launch and landing staffing. *Id.* Accordingly, CIS was informed that launch and landing staffing at KSC would be included in baseline staffing, as evidenced by CIS's December 2008 separate L&L TO proposal, acknowledging that "[t]he firm fixed price baseline for KSC must be sufficient to generate manning for any of the ID/IQ options in the [L&L TO]." AR Tab 118, at 26120.

### vi.     The Defendant-Intervenor's Reply.

WSI replies that CIS's argument that the 2009 SEB's recommendation was based on launch and landing staffing at KSC is a "completely artificial construct." WSI Resp. at 2. In fact, this is why the 2009 SEB allowed WSI to revise its proposal, *i.e.*, to eliminate launch and landing staffing at KSC, and left it to the 2009 SSA to determine whether WSI's superior technical proposal was worth the 3% higher price, when non-price factors were to be considered "significantly more important than price." *Id.*

### b.     The Court's Resolution.

NASA was required to evaluate proposals in accordance with the terms of the Solicitation. *See* 41 U.S.C. § 253b(d)(3) ("[T]he executive agency shall award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the United States, considering *only* cost or price and the other factors included in the solicitation.") (emphasis added); *see also* FAR § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). Adherence to the terms of the Solicitation is a fundamental precept of federal procurement law. *See Banknote Corp. of Am., Inc.* v. *United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the [S]olicitation."). Therefore, a Plaintiff seeking relief "on a claim that the agency used undisclosed evaluation factors . . . must prove that the government evaluated the proposals received on a *significantly different basis* than announced in the [S]olicitation and that [the] plaintiff has been prejudiced as a result." *Hydro Eng'g, Inc.* v. *United States*, 37 Fed. Cl. 448, 471 (1997) (emphasis added). Moreover, the United States Court of Federal Claims has observed that "a [S]olicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Banknote Corp.*, 56 Fed. Cl. at 387. In addition, a procuring agency traditionally has been afforded "great discretion in determining the scope of an evaluation factor." *Forestry Surveys and Data* v. *United States*, 44 Fed. Cl. 493, 499 (1999) (citing JOHN CIBINIC JR. & RALPH C. NASH JR., FORMATION OF GOVERNMENT CONTRACTS 830 (3d ed. 1998)) ("CIBINIC & NASH GOV'T CONTRACTS").

In this case, the parties disagree about what the Solicitation requires. CIS contends that launch and landing staffing at KSC was excluded from the Solicitation. Pl. Mot. at 24-25 (citing to AR Tab 64, at 17889). The Government took a more nuanced approach, *i.e.*, the Solicitation excluded surge launch and landing staffing at KSC, but included "Launch Operations" in the day-to-day baseline effort. Gov't Mot. at 22; *see also* AR Tab 69, at 18976.

As a matter of law, the court employs traditional rules of contract interpretation when interpreting a solicitation. *See Banknote Corp*., 365 F.3d at 1353 n.4 ("The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts."); *see also NVT Technologies, Inc*. v. *United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (applying rules of contract interpretation to construe an ambiguous solicitation provision); *Stratos Mobile Networks USA LLC*. v. *United States*, 213 F.3d 1375, 1380 (Fed. Cir. 2000) ("The RFP, like any contract, must be read in light of its purpose and consistently with common sense.").

In this case, the Solicitation states:

**5.0    Protective Services**

5.0.1. *All requirements* contained within this PWS are considered to be within the day-today *baseline effort*, with the exception of the Unplanned Events paragraph below.

* * *

5.0.2.1.    Planned Special Events

A.    The contractor shall provide protective services for anticipated special events such as, *Launch Operations* . . . and other planned but infrequent activities specified in the Task Order requiring increased effort and additional personnel above that required for normal daily operations. The contractor shall be required to provide timely and responsive support for such events. Planned special events  shall  not necessitate modification to or issuance of an additional Task Order and shall be considered to be within the scope of the priced Task Order.

*At KSC*, the contractor, in conjunction with the TOM, will develop a comprehensive launch protective services plan. This plan will be priced and implemented as a separate ID/IQ Task Order on an annually basis or prior to each launch.

AR Tab 64, at 17889 (emphasis added).

Subsequently NASA was asked the following question:

The KSC TO requires a comprehensive protective services plan to be prepared annually or prior to each launch. Since launch operations is the primary mission for KSC, it would seem that some further definition of typical surge requirements for launches should be discussed in the TO. As the historical information provided no information about manpower surges for launch support, some defined parameters for protective services that NASA wants during launch operations would allow all bidders to intelligently bid on this task.

AR Tab 69, at 18976 No. 183.

In response, NASA answered:

*surges* for launches shall be determined by ID/IQ in the beginning of the contract start and shall be used for each launch.

*Id.*

Therefore, it is clear that proposals for the NPS Contract were to exclude launch (and landing) at KSC. This item would be addressed as part of a comprehensive protective services plan for KSC and subject to future ID/IQ task orders. *See Coast Fed. Bank, FSB* v. *United States,* 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) (holding that when contract provisions "are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them."). The 2009 SEB's conduct, as reflected in the Administrative Record also was consistent with this construction, as it made a substantial effort to be sure that WSI understood that launch and landing staffing at KSC was not part of the Solicitation and allowed WSI an opportunity to remove such staffing from its proposal. AR Tab 64, at 17889; AR Tab 87, at 25098; AR Tab 103, at 25795 ("If it was not for the fact [WSI] had a big one [weakness] at KSC we would not be talking to anyone."); *see also id.* at 25793, 25850, 25855-58, 25874, 25936. In response, WSI removed some staffing from its final proposal, but the 2009 SEB decided a regular or "minor" weakness was still warranted for the remaining inefficiencies:

While WSI did adequately address aspects of the significant weakness for WFF and this part of the significant weakness was considered eliminated, the response was still considered to contain an inefficient use of resources at KSC. After extended discussions over a 3 week period supported by the KSC consultants, the [2009 SEB Voting Members] were in agreement that WSI did not adequately address the significant weakness. The information available continued to support a staffing issue at KSC that constituted a weakness but not to the degree of the significant weakness. The significant weakness was downgraded to a regular weakness.

AR Tab 95, at 25480; *see also* AR Tab 6, at 176 (defining a weakness as a "[m]inor concern").

40

Although CIS disagrees with the 2009 SEB's decision to change WSI's "significant weakness" to a "regular weakness," this is a technical assessment committed to the agency's expertise.  *See E.W. Bliss Co.* v. *United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (holding that decisions such as the technical rankings "involve discretionary determinations of procurement officials that a court will not second guess."); *see also Femme Comp Inc.* v. *United States*, 83 Fed. Cl. 704, 740 (2008) ("A protester's mere disagreement with an evaluation does not provide an adequate basis to overturn the agency's decision.").

CIS is correct that there was a degree of confusion and differing views among some members of the 2009 SEB about the appropriate level of baseline staffing required at KSC.  This debate was well within the scope of the 2009 SEB's assigned duties.  *See* NFS 1815.370(b) ("The SEB assists the SSA by providing expert analyses of the offerors' proposals in relation to the evaluation factors and subfactors contained in the solicitation."); *see also Unisys Corp.* v. *United States*, 89 Fed. Cl. 126, 142, n.8 (2009) (explaining that, although the administrative record evidenced disagreement among evaluation board members, the court would decline to "delv[e] into the process by which each individual evaluator ultimately decided to sign off on the Consensus Report [because that] would involve an examination of the minutiae of the procurement process[.]").  There is no evidence in the Administrative Record, however, that the 2009 SEB actually "evaluated the proposals received on a significantly different basis than announced in the [S]olicitation."  *Hydro Engineering*, 37 Fed. Cl. at 471.  Nor did the 2009 SEB did give WSI "credit" for overstaffing at KSC, or penalize CIS for excluding launch and landing staffing at KSC. AR Tab 95, at 25481.  The Administrative Record reflects that the 2009 SEB's focus was how much WSI should be penalized for staffing "inefficiencies."  AR Tab 103, at 25936; *see also* AR Tab 81, at 24674, 24696.  After wrestling with the staffing issue over a matter of weeks, the 2009 SEB concluded that WSI's revised proposal still was inefficient, but to a lesser degree.  AR Tab 95, at 25481.  This remaining weakness was presented to the 2009 SSA as a "regular weakness" to allow him to make an independent value judgment.  AR Tab 95, at 25481 ("The summary findings document would be revised to reflect the fact the weakness still existed.").

Mr. Summerfield's May 11, 2009 e-mail to the 2009 SEB comparing CIS's initial L&L TO proposal to WSI's revised NPS Contract proposal, however, is problematic:

> In order for the Board to better understand the problems we are dealing with I have included *some additional information from CIS*.  It clearly describes CIS's take on launch and landing and it spells out the additional staffing they propose. As indicated by CIS, they can't perform launch and landing work without substantial additional staffing that appears to bring them very close to the WSI proposed headcount.

AR Tab 119, at 26123 (emphasis added).

The "additional information" cited and attached to this e-mail was CIS's initial L&L TO proposal that was not part of CIS's proposal for the NPS Contract.  *Id.*  This document evidences that Mr. Summerfield may have attempted to inject irrelevant considerations into the 2009 SEB's evaluation.  AR Tab 64, at 17889.  In doing so, Mr. Summerfield also may have engaged in a tradeoff analysis that exceeded the scope of his authority as a 2009 SEB Advisor.  *See* NFS

1815.370(b) ("The SEB will prepare and present its findings to the SSA, avoiding trade-off judgments among either the individual offerors or among the evaluation factors. The SEB will not make recommendations for selection to the SSA.").

The Administrative Record, however, does not evidence that the 2009 SEB actually was influenced by Mr. Summerfield's May 11, 2009 e-mail, particularly since this e-mail was inconsistent with the Mr. Summerfield's earlier views.  AR Tab 95, at 25480-81.  For example, initially Mr. Summerfield vigorously argued that WSI should continue to have a "significant weakness" for not removing a sufficient number of launch and landing staffing from WSI's proposal.  AR Tab 95, at 25480-81.  Later, he reversed course and argued that such staffing should be considered.  AR Tab 119, at 26123.  As a result, his advice on this issue was often questioned and criticized.  *See, e.g.*, AR Tab 81, at 24666, 24674, 24696; AR Tab 103, at 25936, 25855; AR Tab 119, at 26125-26.  More importantly, there is no indication in the Administrative Record that the 2009 SEB relied on this "additional information" in evaluating either CIS's or WSI's proposal.  Consequently, CIS failed to establish that any of Mr. Summerfield's communications with the 2009 SEB prejudiced CIS.[16]  *See* 5 U.S.C. § 706(2) (requiring that "due account shall be taken of the rule of prejudicial error"); *see also CACI Field Servs., Inc.* v. *United States*, 854 F.2d 464, 466 (Fed. Cir. 1988) (holding that differences in evaluation factors and weights do not *ipso facto* establish prejudice, instead "prejudice is a separate element which must be proven").

For these reasons, the court has determined that the 2009 SEB evaluated CIS's and WSI's proposals consistent with terms of the Solicitation, as amended.  *See* AR Tab 69, at 18976.

## 2.   The Allegations in Count III Regarding The 2009 Source Selection Authority.

Count III also alleges that the 2009 SSA improperly "credited [WSI] with proposed staffing for a requirement that was not part of the RFP," and that the 2009 SSA's consideration of "the ability of the offerors to respond to future task orders that were clearly not part of [the NPS Contract]" violated 41 U.S.C. § 253b(d)(3), FAR 15.303, and FAR 15.305, and prejudiced CIS.  Compl. ¶¶ 180-82.

---

[16] Whether CIS ultimately was prejudiced by actions of these individuals will depend on the court's resolution of the allegations in Counts I and II and related paragraphs of Count III, not adjudicated here, as they rely on evidence adduced at the GAO hearing that Messrs. Hattaway and Summerfield improperly influenced the 2009 SEB's findings and the 2009 SSA's award decision.

### a. The Parties' Arguments.

### i. The Plaintiff's Argument.

CIS argues that the 2009 SSA improperly considered launch and landing staffing at KSC, by dismissing the 2009 SEB finding of a "regular weakness" and assuming that WSI's staffing plan:

> might reflect an approach which allowed [WSI] to respond to both basic contract requirements *and future TOs*. I concluded that WSI's proposed staffing *represented* [a] *legitimate business approach to the requirements* and determined any inefficiencies associated with this approach would be reflected in the Pricing factor.

AR Tab 98, at 25566.

The term "future TOs" must refer to launch and landing staffing, because the only "future TO" specifically mentioned in the Solicitation is the requirement for launch and landing staffing at KSC. Pl. Mot. at 28.

The 2009 SSA was aware that competition between the offerors was "virtually a dead heat," except for WSI's two "weaknesses" and CIS's price was $39 million lower than WSI, without any weaknesses. *Id.* Hence, the 2009 SSA could not plausibly award the NPS Contract to WSI, without discounting WSI's "weakness." *Id.* at 28. Therefore, but for the 2009 SSA considering future task orders excluded by the Solicitation, CIS would have been awarded the NPS Contract. *Id.* at 29.

### ii. The Government's Cross-Motion.

The Government responds that the 2009 SSA did not consider launch and landing staffing for surges at KSC as a Solicitation requirement, nor did CIS establish that this was a predominant factor in the 2009 SSA's award decision. Gov't Cross Mot. at 26-27. CIS misrepresents the 2009 SSA's "reasoned decision-making" by a baseless assertion that the 2009 SSA disregarded WSI's "weakness." *Id.* at 27. The Administrative Record, however, evidences that the 2009 SSA did not dismiss WSI's "weakness," but instead considered it as a bidding strategy. AR Tab 98, at 25566.

Even if the 2009 SSA had considered launch and landing staffing for surges at KSC as a Solicitation requirement, the Administrative Record evidences that the 2009 SSA supported his award decision, reasoning that WSI's weakness "was [not] of sufficient importance to influence my assessment of the merits of WSI's Technical Approach." AR Tab 98, at 25566 ("WSI's superiority in Mission Suitability and Past Performance warranted paying a slightly higher price[.]"). Instead, the 2009 SSA emphasized that the NPS Contract was a "services" contract and in his judgment, WSI had "a better understanding as to how to perform the requirements." AR Tab 98, at 25572.

43

For these reasons, CIS failed to establish that the 2009 SSA committed a "clear and prejudicial" violation of any law or procurement regulation. *See Galen Med. Assocs.*, 369 F.3d at 1329-31.

### iii.     The Defendant-Intervenor's Cross-Motion.

WSI takes issue with CIS's contention that the 2009 SSA considered that the award of the NPS Contract was "virtually a dead heat."  WSI Cross Mot. at 28.  In fact, the 3.7% difference between the evaluation scores is greater than the 3.3% difference in price that CIS considers so significant.  *Id.*  Moreover, CIS's statement that WSI never corrected the "significant weakness" is wrong.  *Id.*  In fact, CIS does not challenge the fact that WSI completely corrected the overstaffing at WFF, and  WSI removed all launch and landing staffing from its final proposal.  *Id.*  As such, the "regular weakness" the 2009 SEB assigned to WSI's revised proposal was not an upgrade of the initial "significant weakness," but was considered as a new "weakness" for baseline personnel overstaffing.  *Id.*

Moreover, there is no evidence in the Administrative Record that the 2009 SSA "knew" that WSI's staffing weakness at KSC was a major problem and neutralized that "weakness" in order to award the NPS Contract to WSI.  *Id.*  WSI's staffing weakness was a "regular weakness," which, by definition, was of "minor concern."  AR Tab 97, at 25508.  Even if the 2009 SEB's "regular weakness" finding was adopted by the 2009 SSA, that alone would not have changed the overall award decision.  WSI's Cross Mot. at 35.  The SSA explained that this assigned weakness was not considered to be "of sufficient importance to influence [his] assessment of the merits of [WSI's] Technical Approach."  AR Tab 98, at 25566.

In this same vein, CIS's claim that the 2009 SSA improperly justified WSI's overstaffing at KSC fails to appreciate the difference between surge staffing for launch and landing at KSC and the required baseline staffing.  *Id.*  The 2009 SSA did not justify "WSI's baseline overstaffing number on the basis that the staffing was for the purpose of performing launches and landings security functions, but rather that the staffing reflected WSI's educated view of what an appropriate level of baseline staffing should be in order to provide a proper base for incorporation of launch and landings personnel surges."  *Id.*  For this reason, the 2009 SSA explained that, "if WSI's baseline staffing level was in fact higher than it should be, this would reduce the competitiveness of WSI's price, which would be a factor in the price side of a tradeoff analysis."  *Id.*

### iv.     The Plaintiff's Response.

CIS again repeats the argument that the 2009 SSA had no legitimate basis for rejecting the 2009 SEB's weakness finding for WSI's KSC staffing and "changing it to a *de facto* strength."  Pl. Resp. at 14.  The 2009 SSA's explanation that any overstaffing would be resolved in pricing is irrational, since NASA will pay the higher price for this weakness, not WSI.  *Id.*

### v.     The Government's Reply.

The Government replies that the 2009 SSA's award decision was rational.  Gov't Reply at 5.  The 2009 SSA explained in detail his methodology, including how WSI's "regular weakness"

was evaluated along with other factors and how he concluded that the identified weakness was not "of sufficient importance to influence my assessment of the merits of WSI's Technical Approach."  AR Tab 98, at 25566.

Interestingly, CIS's attack on the 2009 SSA's reasoning that WSI's KSC staffing plan "might reflect a [legitimate business] approach which allowed WSI to respond to both basic contract requirements and future TOs,"  was consistent with CIS's initial L&L TO proposal, indicating that baseline staffing levels "must be sufficient to generate manning" for any subsequent staffing surges.  *Id.* at 6 (quoting AR Tab 98, at 25566; AR Tab 118, at 26120).  For this additional reason, the 2009 SSA reasonably determined that WSI's proposed baseline overstaffing was a bidding strategy, based on a fair assessment of the staffing requirements in the Solicitation.  *Id.* at 7.  In any event, CIS was not prejudiced, because CIS received more favorable staffing ratings.  *Id.*

### vi.    The Defendant-Intervenor's Reply.

WSI replies that CIS cited nothing in the 2009 SSA's Source Selection Statement that converted WSI's "weakness" into a "strength."  WSI Reply at 5.  CIS has failed to recognize that the proper number of baseline personnel is one that will permit the contractor to provide day-to-day protective services at an appropriate level and accommodate any future personnel surges associated with launch and landing or other TOs.  *Id.*  The Administrative Record evidences that CIS understood the connection between baseline and surge staffing:

> The firm fixed price baseline at KSC must be sufficient to generate manning for any of the ID/IQ options represented in the [L&L TO].  That is not currently the case.

*Id.* at 6 (quoting AR Tab 118, at 26120).

Therefore, the 2009 SSA did not exceed Solicitation evaluation criteria, as amended, in concluding that WSI's proposed staffing level met both day-to-day launch and landing and surge requirements.  *Id.* at 7.  In addition, the 2009 SSA provided an alternate rationale for disagreeing with the 2009 SEB's "weakness" finding, *i.e.*, if WSI's proposal was indeed inefficient, the inefficiency would be reflected in WSI's higher price.  *Id.*  CIS, however, has not challenged this rationale.  *Id.*

### b.    The Court's Resolution.

As a matter of law, the 2009 SSA is not bound by the findings of the 2009 SEB, since a SSA is required to exercise "independent judgment" in making a source selection decision.  *See* FAR 15.308 ("While the [SSA] may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment."); *see also DCMS-ISA, Inc.* v. *United States*, 84 Fed. Cl. 501, 515 (2008) (holding that FAR 15.308 "permits the SSA to test and disagree with the evaluators' conclusions"); *Speedy Food Serv. Inc.*, B-258537, 1995 WL 317603 (Comp. Gen. May 2, 1995) ("Source selection officials are not bound by the recommendations of lower-level evaluators, and as a general rule, we will not object to the higher-level official's judgment, absent unreasonable or improper action, even when the official disagrees with an assessment made by a working-level evaluation board or individuals who normally may be

expected to have the technical expertise required for such evaluations."). And, as with any procurement decision, the court is not authorized to second-guess the judgment of a SSA to reject the recommendations of other evaluators, unless no explanation is provided or a decision is a clear and prejudicial violation of the law. *See Savantage Financial Serv*s., *Inc.*, 595 F.3d at 1285-86 ("The court's task is to determine whether (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.") (internal citations omitted).

CIS contends that the 2009 SSA failed to evaluate CIS's proposal according to the Solicitation, by disregarding the 2009 SEB's "weakness finding" and determining that WSI's staffing plan "might reflect an approach which allowed [WSI] to respond to both basic contract requirements and future TOs." AR Tab 98, at 25566; *see also* 4/20/10 TR at 26-27. CIS emphasizes that "future TOs" is synonymous with "launch and landing at KSC," *i.e.*, the same staffing excluded from the Solicitation. Pl. Resp. at 12. CIS, however, failed to cite any evidence in the Administrative Record that substantiates this interpretation. Pl. Mot. at 28. The Solicitation provides clearly for the possibility that other task orders may be issued in the future:

> The Government *may* order additional services on an ID/IQ basis at any time during the base period and option years, in accordance with the task ordering procedure described in RFP Section H.3. Task orders may be issued to support unplanned activities, contingency operations, special events and studies, and may require both direct labor and non-labor resources.

AR Tab 63, at 17298 (emphasis added); *see also id*. at 17046 (requiring the contractor to provide analytical and engineering support "on an *as-needed basis* (to be issued under separate TO(s)")) (emphasis added); *id*. at 17048 ("The requirements of this Performance Work Statement describe the protective services *available for inclusion in this contract*.") (emphasis added); *id*., at 17049 ("The [NPS Contract] is an Indefinite Delivery Indefinite Quantity (IDIQ) firm fixed-price contract with Task Ordering provisions. The nature of the NASA Protective Services Program will *occasionally* require support for unscheduled and unplanned tasks such as those described in sections 2.3.1 and 5.0.2.2.") (emphasis added).

As such, the Solicitation places an offeror on notice that additional task orders *may* be issued in the future:

> Normal workload fluctuations shall not require modification to the Task Order nor issuance of an additional IDIQ Task Order. However, planned special events and unplanned events described in Section 5.0 *may* necessitate work that exceeds effort which would normally be established under the priced Task Order. Such additional work *may* require modification to the Task Order or issuance of an additional IDIQ Task Order as determined by the appropriate Contracting Office depicted in the Task Order.

*Id*. (emphasis added).

Since future task orders were anticipated, Section M of the Solicitation allowed the SSA to evaluate "the appropriateness, completeness, effectiveness and efficiency of the Offeror's *overall approach* to provide and maintain an appropriate balance of skills and resources required to meet the contract, PWS, *and task order requirements*."  AR Tab 63, at 17322 (emphasis added).

Next, CIS infers that the 2009 SSA was biased towards WSI and purposefully used the KSC staffing issue to award WSI the NPS Contract by disregarding the 2009 SEB "weakness" finding.  Pl. Mot. at 27-28.  The October 6, 2009 Complaint, however, does not allege, nor is there any basis in the Administrative Record to infer bias.[17]  Moreover, the "'presumption of regularity' supports official acts of public officers.  In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties." *Butler* v. *Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001); *see also Jazz Photo Corp.* v. *United States*, 439 F.3d 1344, 1351 (Fed. Cir. 2006) (same).  Based on the Administrative Record, the court is satisfied that the 2009 SSA exercised independent judgment in determining that WSI's proposed staffing was not a "technical weakness," but simply was less efficient than CIS's proposal, as reflected in WSI's higher price.  AR Tab 98, at 25566 ("[The 2009 SSA] concluded that WSI's proposed staffing represented a legitimate business approach to the requirements and determined any inefficiencies associated with this approach would be reflected in the Pricing factor.").  As a performance-based acquisition with a Solicitation that clearly contemplated additional staffing task orders, it was reasonable for the SSA to conclude that WSI's more robustly staffed proposal did not demonstrate a lack understanding, but instead represented a "legitimate business approach" to the NPS Contract requirements.  *See* FAR 2.101 (defining a performance-based acquisition as a procurement "structured around the results to be achieved as opposed to the manner by which the work is to be performed.").

Likewise, there is no evidence in the Administrative Record that the 2009 SSA's thought process was "infected" by concerns about launch and landing staffing at KSC.  Pl. Resp. at 16.  In fact, the CO expressly advised the 2009 SSA that this issue was not part of the NPS Contract Solicitation.  AR Tab 103, at 25805 ("To stay consistent, we intend to have it **out**.").  Although the 2009 SSA referred to "future TOs" in his Source Selection Statement, that does not mean that he evaluated the proposals on a "significantly different basis."  *See Hydro Engineering*, 37 Fed. Cl. at 471.  Instead, the 2009 SSA properly exercised his discretion to disagree with the 2009 SEB's "weakness" finding and concluded that WSI's staffing plan "*might* reflect" an approach to respond to both "basic contract requirements and future TOs."  AR Tab 98, at 25566 (emphasis added).

For these reasons, the court has determined that the 2009 SSA did not consider factors outside of the Solicitation or give WSI extra credit for proposed staffing.  The 2009 SSA exercised independent judgment in weighing WSI's one technical "weakness" in the context of the Solicitation and the purpose of the ID/IQ contract.  *See* FAR 16.501-2;[18] *see also Stratos Mobile Networks,* 213 F.3d at 1380 ("The very purpose of an IDIQ contract is to provide flexibility for requirements that cannot be accurately anticipated.").

---

[17] *See* supra n. 17.

[18] FAR 16.501-2 states, in relevant part: "[t]he appropriate type of indefinite-delivery contract may be used to acquire supplies and/or services when the exact times and/or exact quantities of future deliveries are not known at the time of contract award."  48 CFR 16.501-2.

**B.**     **Count IV - Whether The 2009 Source Evaluation Board Findings And The 2009 Source Selection Authority's Award Decision Lacked A Rational Basis In Violation Of 5 U.S.C. § 706, Because The National Aeronautics Space Administration Did Not Know Its Own Requirements At Kennedy Space Center.**

**1.**     **The Allegations In Count IV.**

Count IV alleges that, because NASA failed to conduct an independent government estimate ("IGE") of the appropriate staffing required at KSC, the 2009 SEB improperly decided to use the J-BOSC as a "benchmark" for WYE. Compl. ¶ 189; *see also id*. at ¶¶ 183-88. Because "this 'benchmark' included staffing for surge launches and landings at KSC, it disguised the actual magnitude of [WSI's] overstaffing." *Id*. at ¶ 189. As a result, the 2009 SEB could not "rationally evaluate" the proposals or "know the true extent to which [WSI] was proposing to overstaff at KSC." *Id*. at ¶ 191. The error led the 2009 SSA to dismiss the import of WSI's weakness and to treat WSI's proposal as addressing "both basic requirements and future TOs." *Id*. at ¶ 192. As a result, both the 2009 SEB findings and 2009 SSA award decision lacked a rational basis in violation of 5 U.S.C. § 706. *Id*. at ¶¶ 183-192.

**2.**     **The Parties' Arguments.**

**a.**     **The Plaintiff's Motion.**

The Solicitation stated that Mission Suitability was the most important evaluation factor and Technical Approach the most important subfactor. AR Tab 63, at 17221, 17330. In describing both, the Solicitation emphasized the need for "adequacy and realism of resources." AR Tab 63, at 17321. NASA, however, never conducted an IGE for staffing at KSC. Pl. Mot. at 30. The Administrative Record evidences that during the evaluation, the 2009 SEB discussed five different staffing levels and the record is replete with communications demonstrating confusion and disagreement about this issue. *Id.* In fact, ten days before the 2009 SEB made a final presentation to the 2009 SSA, the CO observed:

> If we introduce a new IGE at this stage, I think we must relook at CIS. Someone is going to ask us why we moved and keep moving. We just don't have a good answer. I think we look better if we just stay at approximately 343[.]

AR Tab 119, at 26126.

Without a reliable IGE, CIS argues that the 2009 SEB could not rationally evaluate the proposals or assess the extent of WSI's overstaffing at KSC. Pl. Mot at 32. Had KSC staffing been better understood, the 2009 SEB could not have justified only reducing WSI's "significant weakness" to a "regular weakness." *Id.* If an accurate IGE had been ascertained, WSI's revised proposal would have retained a "significant weakness." Pl. Mot at 32; *see also* 4/20/2010 TR 72:14-16 ("[Y]ou never have a rational discussion from the members of the board as to why that weakness came down."). Because WSI's overstaffing was obscured, WSI's "significant

48

weakness" in the Technical Approach Subfactor was erroneously upgraded to a "regular weakness." Pl. Mot at 32. This error made WSI's proposal appear technically superior to CIS's proposal, allowing the 2009 SSA to justify selecting WSI's more expensive proposal. *Id*. at 36-37. In addition, it was not rational for the 2009 SSA to dismiss WSI's "weakness" and convert it to a "legitimate business approach." *Id*. But for these errors, CIS "would have had more than 'significant chance' of being awarded the contract; it would have been well nigh impossible for the SSA to avoid awarding the contract to [CIS]." *Id*. at 32-33.

### b.      The Government's Cross-Motion.

The Government concedes that the 2009 SEB took several months to determine the staffing requirements for KSC, but ultimately settled on 343 WYE. Gov't Cross Mot. at 29. The 2009 SEB then used this number in making the February 2009 initial finding. *Id*. at 29. It is also true that there were internal discussions among members of the 2009 SEB until the week before the 2009 SEB's final presentation to the 2009 SSA. *Id.* at 29-30. In the end, however, there was no difference between staffing levels disclosed in the 2009 SEB's initial presentation and the 2009 SEB's final presentation to the 2009 SSA. *Id.*

Whether the "true" number of launch and landing staff at KSC was different than that used by CIS to price the NPS Contract is beside the point. *Id*. at 28-30. The Administrative Record reflects that the 2009 SSA's trade-off analysis took the price differences between the proposals into account, but determined that WSI's superior technical proposal outweighed WSI's higher price. *Id*. (citing AR Tab 98, at 25572-73). Moreover, CIS cites no Administrative Record reference showing that the 2009 SSA relied either on the J-BOSC KSC staffing estimate or on any other KSC staffing estimate. *Id*. at 31-32. As the SSA explained, the award decision was based on *numerous* price and non-price-related factors, "not upon any particular KSC staffing estimates." AR Tab 98, at 25564-73.

In addition, the 2009 SSA's assessment of KSC's staffing was based on a thorough understanding of the Solicitation's requirements, despite CIS's assertion otherwise. Gov't Cross Mot. at 31-32. The 2009 SSA made a fair assessment of WSI's KSC staffing proposal by considering the 2009 SEB's "weakness" finding but exercised his independent judgment in concluding that WSI's proposed staffing was a "legitimate business approach." AR Tab 98, at 25566. Although a different decision-maker may have reached another conclusion, the 2009 SSA's Source Selection Decision reflects an analysis that was neither arbitrary nor capricious. Gov't Cross Mot. at 31-32.

### c.      The Defendant-Intervenor's Cross-Motion.

WSI insists that CIS could not have been prejudiced by the changing staffing estimates at KSC. WSI Cross Mot. at 30. Instead, it was WSI that was harmed. *Id*. Moreover, CIS exaggerates the number of staffing estimates, because the March 12, 2009 estimate of 421.1 WYE was never relied on by the 2009 SEB. *Id.* Even after discussions were reopened and WSI's proposal was revised, WSI still was found to have overstaffed KSC by 30 positions. *Id.* But, the 2009 SEB recognized that this was an error, because this overstaffing estimate included trainer positions that were not part of the J-BOSC. AR Tab 81, at 24679. By May 11, 2009, a majority of

the 2009 SEB agreed that KSC's overstaffing was only 13.22 WYE.  AR Tab 119, at 26123-24.  A minority, however, thought that WSI's overstaffing was in the range of 30-35 WYE.  WSI Cross Mot. at 35.  After further consideration, a consensus was reached that found WSI's overstaffing to be 13.22 WYE, a number that the 2009 SEB did not consider to be a "significant weakness."  *Id.* As an additional check on this finding, the 2009 SEB compared WSI's staffing proposal to the J-BOSC.  *Id.* at 31.  In doing so, the 2009 SEB learned that WSI's proposal was overstaffed by 7%. *Id.*  Comparing WSI's proposal to the consensus IGE showed that WSI's proposal was overstaffed by 13.22 WYE or 3.65%.  *Id.* (citing AR Tab 97, at 25545).  Therefore, it was WSI, not CIS that was disadvantaged by the 2009 SEB's use of the J-BOSC as a benchmark.  *Id.*  WSI's only other weakness was overstaffing baseline personnel, but WSI removed those personnel when discussions were reopened.  *Id.* at 35.

### d.    The Plaintiff's Response.

CIS responds that the Administrative Record demonstrates that the 2009 SEB spent a great deal of time debating the appropriate level of staffing at KSC and was never confident that the optimal number of WYE for baseline security was ascertained.  Pl. Resp. at 17.  Although the Government claims that 343 WYE was the final staffing number considered by the 2009 SEB, that number is not mentioned in the final briefing to the 2009 SSA.  *Id.* (citing AR Tab 95, at 25545). In addition, at various times the CO, the SEB Price Analyst, and the 2009 SEB Chair expressed doubts about the accuracy of staffing levels at KSC.  AR Tab 81, at 24665; AR Tab 119, at 26125-126.  Without consensus, the 2009 SEB simply settled on 343 WYE to "look better" before the 2009 SSA.  AR Tab 119, at 26126.

The Government cannot "brush off" WSI's weakness with the 2009 SSA's post-hoc justification that WSI's overstaffing was part of an intentional "bidding strategy."  Pl. Resp. at 20-21 (citing *SEC* v. *Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The validity of the SSA's decision should be judged by the reasons stated in that decision and supported by the record, not by an afterthought advanced by counsel.")).  Neither the Solicitation nor the FAR allows an agency to give an offeror "extra-credit" for "bidding strategy."  *Id.*  Instead, the agency must determine whether the offeror understood and complied with the requirements as stated in the Solicitation. *Id.*

### e.    The Government's Reply.

The 2009 SEB reached a consensus that 343 WYE should be used as the staffing estimate at KSC, before its final presentation to the 2009 SSA.  Gov't Reply at 9-10.  That estimate was not unreasonably high, but even if the 2009 SEB used a lower staffing estimate, the 2009 SSA's analysis would not have changed, because the relative prices of the two proposals were not changed.  *Id.*

### f.      The Defendant-Intervenor's Post Hearing Supplemental Brief.[19]

After oral argument, WSI counters that CIS incorrectly assumes 343 WYE includes staffing for launch and landing: "If the 343 WYE number included L&L personnel, then it would not be possible that WSI's proposed 366.85 WYEs were 4 WYEs fewer than the [J-BOSC] staffing inclusive of L&L personnel." WSI Supp. Br**.** at 2 (emphasis in original).    Since the 2009 SEB stated that WSI's proposal of 366.85 WYE was 4 WYE fewer than the J-BOSC staffing, including launch and landing personnel, the J-BOSC staffing must be 371 WYE, not 343.  *Id.*  Therefore, CIS should have received a weakness for significantly understaffing CIS's proposal, and could not have been prejudiced by this comparison. *Id*. at 3.

### g.      Plaintiff's Closing Brief.

CIS responds that the Government has conceded that the IGE of 343 WYE includes surge launch and landing staffing.  Pl. Cl. Br. at 1-2.  Therefore, the 2009 SEB failed to comprehend the extent of WSI overstaffing, when it relied on the J-BOSC as a benchmark for an IGE. *Id.*  This erroneous comparison led the 2009 SEB to reduce WSI's significant weakness. *Id*. at 2.  In addition, the 2009 SEB failed to provide a rational explanation for the reduction of the "significant weakness." *Id*.  This change from a "significant weakness" to a "regular weakness" prejudiced CIS, because it resulted in the 2009 SEB adding 5% and 21 points to WSI's overall score in a very close competition. *Id.*

### 3.      The Court's Resolution.

The Solicitation did not require NASA to evaluate staffing proposals by comparing them to an IGE.  AR Tab 63, at 17322-23.  In fact, strict adherence to an IGE for staffing arguably would be inconsistent with a "performance-based acquisition" that is "structured around the *results to be achieved as opposed to the manner by which the work is to be performed*."  FAR 2.101 (emphasis added).  In a contract for services, like the NPS Contract, the agency is required to use a performance-based acquisition method "to the maximum extent practicable."  FAR 37.102 (reciting the statutory preference, Pub. L. No. 106-398 § 821, for using a performance-based acquisition in service contracts).  In this case, NASA satisfied this requirement by using a PWS in the Solicitation, defined as a "statement of work for performance-based acquisitions that describes the required *results* in clear, specific and objective terms with measurable *outcomes*." *Id*. (emphasis added).  CIS relies on *OMV Medical, Inc.*, v. *United States,* 219 F.3d 1337 (Fed. Cir. 2000), for the proposition that a procurement decision cannot be rational, if it is "tainted by irrational assumptions or critical miscalculations[.]" *Id*. at 1344.  *OMV Medical*, however, holds that for an "analysis to be rational, it is not necessary that it be performed with impeccable rigor." *Id*.  As in *OMV Medical*, the 2009 SEB's analysis was necessarily an "exercise in approximation." 219 F.3d at 1344.  Moreover, as the predecessor to the United States Court of Appeals for the Federal Circuit observed, a contractor in an indefinite-quantity contract "cannot expect the kind of accuracy in estimation that it can in a requirements or fixed price contract."  *Dot Systems, Inc*. v. *United States*, 231 Ct. Cl. 765, 768 (1982); *see also Ouachita Mowing, Inc*. B- 276075, 97-

---

[19] WSI's December 22, 2009 Reply did not address Count IV, although WSI submitted post-argument briefing.

1 CPD ¶ 167, 1997 WL 230867, *2 (Comp. Gen. May 8, 1997) ("[W]hen formulating estimates, procuring agencies are required to utilize the best information available; the estimate need not be absolutely correct, but must be a reasonably accurate representation of the agency's anticipated needs.").

Portions of the Administrative Record reflect that the 2009 SEB was frustrated with KSC's inability to quantify anticipated staffing needs in terms of WYE.  AR Tab 81, at 24648; AR Tab 81, at 24651; AR Tab 119, at 26121-26.  After considerable discussion, the 2009 SEB decided that the best information available was the J-BOSC staffing number of 343 WYE, because it was consistent with the January 2009 initial evaluation and derived from actual "boots on the ground" staffing data.  AR Tab 119, at 26125-26.  In addition, the 2009 SEB findings did not obscure WSI's overstaffing.  In fact, the 2009 SEB's findings contained a specific caveat to alert the 2009 SSA that J-BOSC staffing was used as a benchmark, but it was an "approximation" that included surge launch and landing staffing at KSC.  AR Tab 97, at 25545.  The 2009 SEB did not hide this from the 2009 SSA.  AR Tab 103, at 25936.  Comparing WSI's proposal to the J-BOSC staffing was not intended to be exact, but a means to explain why the 2009 SEB determined that WSI warranted a "weakness" for KSC staffing.  AR Tab 97, at 25545 ("[WSI's proposal] is only four WYE less than the Offeror's current KSC base workforce *which contained an ongoing requirement to support shuttle launch and landing*.") (emphasis added); *see also* AR Tab 119, at 26125-27.

Although CIS may disagree with the 2009 SEB's decision to use the J-BOSC as a benchmark, this is not a basis for overturning an agency's determination of its own needs.  *See Savantage Fin. Servs.*, 595 F.3d at 1286 (holding that "competitors do not dictate an agency's minimum needs, the agency does. And determining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.") (internal quotations omitted); *see also Mark Dunning Industries, Inc.*, B-230058, 88-1 CPD ¶ 364 (Comp. Gen. April 13, 1988) (holding that the GAO "will not overturn an agency determination of its minimum needs simply because the protester argues that its calculations are more correct").

The court must assess the rationality of the 2009 SSA's award decision by determining whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion[.]"  *Axiom Res. Mgmt.*, 564 F.3d at 1381 (citations omitted).  In this case, the 2009 SEB initially assessed WSI with a "significant weakness" for overstaffing at two facilities: KSC and WFF.  At that time, WSI's overstaffing at these facilities was estimated to be 70 WYE and 27 WYE, respectively.  AR Tab 79, at 24344, 24312.  After further discussions with NASA, WSI revised its proposal to eliminate 34.95 WYE from WSI's KSC proposal and another 27.17 WYE from WSI's WFF proposal. AR Tab 30, at 6372-74.  In addition, WSI's revised proposal specifically committed to "address all launch operations support through IDIQ task orders in all contract years."  AR Tab 30, at 6372.  After receiving WSI's revised proposal, the 2009 SEB found that WSI had resolved the overstaffing issue at WFF and eliminated one of the grounds for the "significant weakness" finding.  AR Tab 93, at 25368; AR Tab 95, at 25481.[20]  The 2009 SEB

---

[20] Although staffing at KSC was the predominant factor in the 2009 SEB's initial significant weakness finding (AR Tab 103, at 25793-94, 25795), the 2009 SEB, ultimately considered the overstaffing at KSC and WFF as a single "significant weakness."  AR Tab 79, at 24344; AR Tab 88, at 25131-32.

also found that WSI removed 34.95 WYE from the KSC portion of the proposal.  AR Tab 95, at 25481.  After considerable debate, the 2009 SEB came to a consensus that WSI's revisions, while not completely "adequate," were sufficient to reduce the "significant weakness" finding to a "regular weakness," *i.e.*, a "minor concern."  AR Tab 95, at 25481; AR Tab 6, at 176.  Again, this was a technical decision that is subject to considerable agency discretion.  *See E.W. Bliss Co.*, 77 F.3d at 449; *see also Axiom Res. Mgmt.*, 564 F.3d at 1381; *Fire-Trol Holdings LLC* v. *United States*, 66 Fed. Cl. 36, 40 (2005) (when the [c]ourt considers a purely factual question within an area of competence of an administrative agency created by Congress, the [c]ourt will recognize the relevant agency's technical expertise and defer to its analysis unless it is without substantial basis in fact.") (internal quotations omitted).  But the 2009 SEB still found that WSI's proposal was inefficient, because it was more heavily staffed than the J-BOSC.  AR Tab 97, at 25545; AR Tab 95, at 25481 ("The information available continued to support a staffing issue at KSC that constituted a weakness but not to the degree of the significant weakness.").

The 2009 SEB then presented final findings to the 2009 SSA based, on the best information available, *i.e.*, the J-BOSC staffing, to allow the 2009 SSA to "determine what weight or significance it merits."  AR Tab 119, at 26121.  In light of the fact that the Solicitation did not require an empirical evaluation of the "adequacy and realism of resources," the 2009 SEB's decision to describe WSI's technical weakness at a "macro" level was consistent with the Solicitation's evaluation criteria and rational.  AR Tab 63, at 17321-23; AR Tab 81, at 24696.  The 2009 SEB further advised the 2009 SSA that the overstaffing in WSI's proposal was broad-based and not specific to any one function.  AR Tab 97, at 25545 ("The inefficient staffing is not isolated to a single function but is embedded throughout the security services functions and reflects an inefficient approach to the KSC TO and a misunderstanding of the requirements at KSC.").  The fact that the 2009 SEB did not arrive at an exact number to explain WSI's overstaffing does not render its findings irrational.  The 2009 SEB's findings were explained in a manner that was fair to both CIS and WSI and reasonable.  Likewise, the 2009 SSA's subsequent decision not to afford WSI's technical "weakness" the same weight as the 2009 SEB was not "tainted by irrational assumptions or critical miscalculations," but was a reasoned exercise of his independent judgment.  AR Tab 95, at 25481; AR Tab 103, at 25855-58, 25887, 25936; AR Tab 119, at 26121-27.  Furthermore, unlike in *OMV Medical*, the SSA expressly did not rely on the 2009 SEB staffing estimates in making the award decision.  *Compare* 219 F.3d at 1344 (observing that the CO relied on the erroneous calculations in making an award decision), *with* AR Tab 98, at 25569 ("the staffing at KSC did not influence my opinion regarding the technical merits of [WSI]'s proposal because I believed [WSI]'s proposed approach was an acceptable way to staff KSC's requirements.").

For these reasons, the court has determined that the 2009 SSA's award decision was balanced, well-documented, and rational.  *See Info. Sciences Corp.* v. *United States*, 80 Fed. Cl. 759, 796 (2008) ("[T]he court reviews the record as a whole in determining whether the SSA's conclusions are rational and supported.") (internal citations omitted).

**C.      Count V - Whether The 2009 Source Selection Authority's Award Decision Was Arbitrary And Capricious.**

**1.      The Allegations in Count V.**

Count V alleges that the 2009 SEB's decision to use the J-BOSC that included surge launch and landing staffing at KSC as a "benchmark" against which CIS's and WSI's proposals were compared, instead of an IGE: violated the terms of the Solicitation; "disguised the true extent of [WSI's] overstaffing;" and led the 2009 SSA to conclude that WSI's proposal reflected "[a]n approach which allowed [WSI] to respond to both basic contract requirements and future TOs," in violation of 5 U.S.C. § 706.  Compl. at ¶¶ 209; *see also id.* at ¶¶ 193-200.

**2.      The Parties' Arguments.**

**a.      The Plaintiff's Motion.**

CIS argues that the 2009 SEB's decision to compare CIS's and WSI's staffing proposals with the J-BOSC was unlawful.  Pl. Mot. at 33.  The 2009 SEB's Pricing Analyst recognized this problem in warning that "a comparison of that nature would be outside of our Section M evaluation criteria."  *Id.* at 35 (citing AR Tab 81, at 24666).  The 2009 SEB Chair also recognized the same problem: "Our section M says we are going to eval agst [*sic*] IGE yet as you know we are using benchmark on the ground."  *Id.* (quoting AR Tab 81, at 24668).

For these reasons, the 2009 SEB's decision to make this comparison violated FAR 15.404-1(b)(2), because the J-BOSC was not a "same or similar item[s]."  First, the J-BOSC was a cost-plus contract, and second, the J-BOSC included launch and landing staffing at KSC.  *Id.*  This comparison also disguised the extent of WSI's overstaffing and made it easier for the 2009 SSA to downplay WSI's staffing weakness.  *Id.* at 36-37.

**b.      The Government's Cross-Motion.**

The Government argues that the 2009 SEB reasonably compared the offerors' proposals against the J-BOSC, because an agency can use "various price analysis techniques and procedures to ensure a fair and reasonable price."   Gov't Cross Mot. at 31-32 (quoting FAR § 15.404-1(b)(2)).  Therefore, comparisons to prior contracts "for the same or similar items," even if not specifically referenced in a solicitation, are not *per se* unlawful or unreasonable.  *Id.* at 32-33 (quoting FAR § 15.404-1(b)(2)(i)(ii)).  As a result, CIS was not "significantly prejudiced."  *Id.* at 34.

**c.      The Defendant-Intervenor's Cross-Motion.**

WSI observes that comparing CIS's and WSI's proposals to the J-BOSC is not contrary to the Solicitation.  WSI Cross Mot. at 32-33.  The e-mails between the 2009 SEB Pricing Analyst and 2009 SEB Chair concerned a comparison of productive hours that the 2009 SEB abandoned and were not included in the 2009 SEB's final presentation.  *Id.* at 33.  In addition, the reference to an "IGE" in Section M of the Solicitation refers to price estimates, not staffing.  *Id.* (citing AR Tab 65, at 18599).  In fact, there is no requirement in the Solicitation that the 2009 SEB was required to

determine staffing levels by referring to an IGE.  *Id.*  In any event, comparing the proposals to the J-BOSC would prejudice WSI, not CIS, because such a comparison made WSI's staffing proposal at KSC appear more inefficient than CIS's proposal.  *Id.*

### d.    The Plaintiff's Response.

CIS counters that the 2009 SEB determined WSI's baseline staffing proposal of 366.85 WYE for the NPS Contract was 7% higher than the J-BOSC, which utilized only 343 WYE.  Pl. Resp. at 18.  Since, the J-BOSC included launch and landing staffing at KSC, a fair assessment would require the 2009 SEB to subtract 35 WYE from the J-BOSC.  *Id.* at 19-20.  35 WYE is an appropriate number, because WSI stated that it needed 35 WYE to support launch and landing at KSC.  *Id.* at 19.  Therefore, the number of non-launch and landing staffing in the J-BOSC was 308 WYE (*i.e.*, 343 minus 35 or 308).  *Id.*  As a result, CIS argues that, a "proper comparison" would result in "WSI's continued overstaffing by approximately 58.85 WYE[.]"  *Id.* at 19-20.  An adjusted comparison shows the actual magnitude of WSI's failure to understand the staffing requirement at KSC, an issue that the 2009 SEB never explained to the 2009 SSA.  *Id.* at 20.

CIS also argues that comparing staffing proposals for the NPS Contract to the J-BOSC evidences that the 2009 SEB's evaluation was "infected" with the issue of future launch and landings at KSC, an issue that was outside the scope of the Solicitation.  *Id.* at 18.  This improper comparison resulted in the 2009 SSA Source Selection Statement being "tainted by irrational assumptions or critical miscalculations."  *Id.* at 20 (quoting *OMV Medical*, 219 F.3d at 1344).

### e.    The Government's Reply.

The Government did not reply to Plaintiff's Response on this issue.

### f.    The Defendant-Intervenor's Reply.

WSI emphasizes that this comparison prejudiced WSI, not CIS.  WSI Reply at 3.  At one point, the 2009 SEB decided that an IGE for KSC staffing should be 353 WYE.  *Id.* Since WSI proposed 366 WYE baseline personnel, this proposal was only overstaffed by 13.22 WYE (*i.e.*, 366 minus 353).  *Id.*  Prior to presenting findings to the 2009 SSA, the 2009 SEB reverted to using 343 WYE as a surrogate for an IGE.  *Id.* (citing AR Tab 119, at 26125-27).  Accordingly, the 2009 SEB reported to the 2009 SSA that WSI overstaffed KSC by 7% over 343 WYE.  *Id.*  This comparison advised the 2009 SSA that WSI overstaffed KSC by 23 WYE instead of 13.22 WYE (*i.e.*, 366 minus 343).  *Id.*  Therefore, the 2009 SEB's comparison did not "minimize" WSI's weakness, but made it appear worse.  *Id.* at 3-4.

### 3.    The Court's Resolution.

As a threshold matter, CIS's argument that the 2009 SEB improperly relied on J-BOSC staffing as a benchmark, in violation of FAR 15.404-1(b)(2), fails to recognize that this regulation

applies only to price evaluation.[21]  *See* FAR 15.404-1(a) ("The objective of proposal analysis is to ensure that the final agreed-to *price* is fair and reasonable.") (emphasis added).  CIS cites no authority, nor is the court aware of any, that renders FAR 15.404-1(b)(2) applicable to an agency's evaluation of *technical* requirements.  Even if FAR 15.404-1(b)(2) were applicable, as the court previously has explained; the 2009 SEB disclosed to the 2009 SSA that the J-BOSC comparison was an imperfect one, and the 2009 SEB's resulting decision to upgrade WSI's "significant weakness" to a "regular weakness," was a technical assessment, subject to the agency's discretion.  *See E.W. Bliss Co.*, 77 F.3d at 449; *see also Beta Analytics Int'l, Inc.* v. *United States,* 67 Fed. Cl. 384, 395 (2005) ("The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of the procurement officials, and thus reviewing courts give greatest deference possible to these determinations.").

In addition, the 2009 SEB's use of the J-BOSC as a benchmark could not have violated the terms of the Solicitation, because the Solicitation did not require the Government to evaluate staffing proposals against an IGE.  Moreover, even if the Solicitation did require use of an IGE, how an IGE is ascertained would be a matter within the "broad discretion of agency officials" and not subject to disclosure to offerors.  *Savantage Fin. Servs.*, 595 F.3d at 1286; *see also Mark Dunning Industries, Inc.*, B-230058, 88-1 CPD ¶ 364 (holding that "an agency is not required to disclose in the solicitation a manning level developed by the agency evaluators to assess whether proposed personnel were adequate where, as here, such model is developed based on tasks in the solicitation and reflects the evaluators judgment concerning the minimum number of personnel necessary to perform the work.  Thus, the only requirement is that the RFP place offerors on notice that this is an area which will be evaluated.").

The fact that WSI's proposal contained more WYE than the J-BOSC did not necessarily mean that WSI's proposed staffing warranted a "significant weakness."[22]  As a matter of law, if the

---

[21] Count V does not reference FAR 15.404-1(b)(2) in the Complaint.  Compl. at ¶¶ 183-92. Nevertheless, FAR 15.404-1(b)(2) states, in part:

> The Government may use various *price* analysis techniques and procedures to ensure a fair and reasonable *price*.  Examples of such techniques include, but are not limited to, the following:
>
> . . . (ii) Comparison of previously proposed *prices* and previous Government and commercial contract prices with current proposed *prices* for the same or similar items, if both the validity of the comparison and the reasonableness of the previous *price(s)* can be established.

48 C.F.R. 15.404-1(b)(2) (emphasis added).

[22] In fact, CIS conceded at oral argument that historical comparisons generally are an appropriate method for an agency to estimate requirements.  *See* 4/20/2010 TR 22:8-11; *see also* FAR 16.504 ("The contracting officer should establish a reasonable maximum quantity based on market research, trends on recent contracts for similar supplies or services, survey of potential users, or any other rational basis.").  That is what the 2009 SEB did in using the J-BOSC as a benchmark.

agency's explanation reflects "rational reasoning and consideration of relevant [agency] factors," the court is required to defer to the agency's decision, even if it is one the court would have determined differently.  *See Savantage Fin. Servs.*, 595 F.3d at 1286 ("[W]e must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors") (internal quotations omitted); *see also Honeywell, Inc.* v. *United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's [procurement decision], the court should stay its hand even though it might, as an original proposition, have reached a different conclusion[.]").  As discussed above, the Administrative Record demonstrates that the 2009 SEB's decision to reduce the severity of WSI's "significant weakness" "evince[d] rational reasoning and consideration of relevant factors[.]"  *Savantage Fin. Servs.*, 595 F.3d at 1286.  Under this standard, the 2009 SEB's final findings were neither arbitrary nor capricious.

The court has also already determined that the 2009 SSA was not misled or confused by the 2009 SEB's use of the J-BOSC staffing as a benchmark.  The 2009 SEB's final presentation to the 2009 SSA was made with an express caveat that the J-BOSC comparison included surge launch and landing staffing.  AR Tab 97, at 25545 ("The proposed baseline of 366.85 WYEs is approximately 7% higher than the actual delivered WYEs on the current contract at KSC and is only four WYE less than the Offeror's current KSC base workforce *which contained an ongoing requirement to support shuttle launch and landing*.") (emphasis added).  In addition, although CIS has argued that this comparison was improper, CIS does not contest the factual accuracy of this comparison.

For these reasons, the court has determined that the 2009 SSA's award decision did not violate FAR 15.404-1(b)(2), nor was it arbitrary or capricious.

### D.    Count VI – Whether The 2009 Source Selection Authority Engaged In An Improper Trade-Off Analysis.

#### 1.    The Allegations In Count VI.

Count VI alleges that the 2009 SSA engaged in an improper trade-off analysis, as evidenced by the June 18, 2009 Source Selection Statement.  First, under the Technical Approach Subfactor, the 2009 SSA acted improperly and contrary to the Solicitation in three ways: (1) "dismissing [WSI's] weakness for overstaffing at KSC;" (2) discounting WSI's weakness for proposing to use "local law enforcement to augment security" within an exclusive federal jurisdiction at the MSFC; and (3) allowing WSI to correct understaffing at MAF, without adequately providing "security for foreign travel, technology, protection or communications security," all of which demonstrated that WSI failed to understand the NPS Contract requirements.  Compl. ¶¶ 210-228.   Second, under the Management Approach Subfactor, the 2009 SSA unreasonably equated WSI's significant strength for the proposed comprehensive phase-in plan with CIS's significant strength for an exceptional quality management program.  *Id.* at ¶ 229.  Third, the 2009 SSA engaged in "disparate treatment" in failing to mention in the Source Selection Statement that CIS had a significant strength in Small Business participation.  *Id*. at ¶¶ 229-30.

### 2.      The Parties' Arguments.

### a.      The Plaintiff's Motion.

According to CIS, the 2009 SSA's trade-off analysis was arbitrary, capricious, an abuse of discretion, and lacked a rational basis. Pl. Mot. at 37. The 2009 SSA "did not consider the weaknesses [that] the [2009] SEB identified in [its] assessment of the technical merits of [WSI]'s proposal[.]" AR Tab 98, at 25569. Instead, the 2009 SSA perceived that these issues were "readily correctable." AR Tab 98, at 25566. Accordingly, the 2009 SSA stated that "[he] did not place importance on the weaknesses [that the 2009] SEB gave [WSI] due to staffing problems at KSC, MSFC and MAF." AR Tab 98, at 25569. Consequently, the 2009 SSA concluded that WSI understood the requirements at these three installations, but "provided no convincing rationale for completely disregarding the [2009] SEB's findings that WSI did not understand the requirements at KSC, MAF and MSFC." Pl. Mot. at 37. The Solicitation, however, requires that "adequacy and realism of resources will be considered in evaluating Mission Suitability as an indicator of the Offeror's understanding of the requirements." Pl. Mot. at 37 (quoting AR Tab 63, at 17321). Therefore, the 2009 SSA, violated the terms of the Solicitation by conceding that he did not personally review CIS's or WSI's proposals or notes of the 2009 SEB, but based his decision on the 2009 SEB's presentation. *Id.* at 38 (citing AR Tab 98, at 25564-65).

In evaluating the Management Approach Subfactor, the 2009 SSA unreasonably viewed each offerors' "significant strength" as being functionally the same. *Id*. at 39. CIS received a "significant strength" for "exceptional quality management system supported by a strong process improvement program." *Id.* (citing AR Tab 97, at 25514). This strength impacted performance for the duration of the contract. *Id.* On the other hand, WSI received a "significant strength" for a comprehensive phase-in plan that would impact only the initial performance of the contract. *Id.* The 2009 SSA, however, found no meaningful distinction between these two significant strengths. *Id.* By failing to do so, the "[2009] SSA's judgment about the significance of the competing proposals shows a critical lack of long-term perspective on contract performance." *Id.*

The 2009 SSA also ignored CIS's "significant strength" in Small Business Participation. *Id.* This was the only factor where the 2009 SEB gave one offeror a higher adjectival rating than the other, but the 2009 SSA stated that he "did not find any discriminators with regard [t]o the Offerors' Small Business Participation." *Id.* (quoting AR Tab 98, at 25571). This admission evidences the "disparate treatment of the offerors" by the 2009 SSA, and "undermines the importance of the small business goals set in the RFP." *Id.*

### b.      The Government's Cross-Motion.

The 2009 SEB determined that WSI did not understand certain staffing requirements, the 2009 SSA made the award decision, relying on his extensive experience in the procurement field. Gov't Cross Mot. at 37-38. Although the 2009 SSA "generally agreed" with the 2009 SEB findings, he disagreed with the weakness assigned to WSI regarding staffing at KSC, MSFC, and MAF. AR Tab 98, at 25569. Instead, the 2009 SSA concluded that WSI's proposal was "an acceptable way to staff KSC's requirements." *Id.* The 2009 SSA also determined that the staffing weaknesses identified at MSFC and MAF were "very minor." *Id.* Further, the 2009 SSA

considered these as "readily correctible" weaknesses and determined, on balance, that WSI's superior understanding of the technical requirements "greatly offset" WSI's identified weaknesses. *Id.* Therefore, the Award Decision was based on a reasoned and detailed analysis of the strengths and weaknesses of WSI's proposal.

The 2009 SSA identified three Management Approach discriminators and explained why WSI submitted a "slightly superior Management Approach," based on a totality of these factors. AR Tab 98, at 25570-71. But, after conducting a thorough analysis and weighing the significant strengths of both offerors, the 2009 SSA concluded WSI's Management Approach warranted a slight advantage. AR Tab 98, at 25569-71.

In addition, the 2009 SSA properly considered CIS's "significant strength" in the Small Business Participation Approach Subfactor. Gov't Cross Mot. at 42. Here, CIS received a "Very Good" rating, but WSI missed a "Very Good" rating, by only one point. AR Tab 97, 25527. The difference was attributed to the fact that CIS greatly exceeded the goals in two sub-categories of Small Business Participation and WSI only met or exceeded all of the sub-category goals. Accordingly, the Administrative Record evidences that both proposals were fairly rated. AR Tab 98, at 25571.

### c.      The Defendant-Intervenor's Cross-Motion.

WSI adds that the 2009 SSA's decision was fully documented and rational. WSI's Cross Mot. at 36-37. Moreover, because the 2009 SSA is charged with making a "best value" decision, he may reasonably determine that the higher priced offeror's proposal was worth the extra cost based on the superior value of the non-price factors. *Id.* at 37.

The court needs to keep in mind that the 2009 SEB prefaced all weaknesses by stating that the offeror has a "misunderstanding of the requirements." *Id.* This mere prefatory phrase, however, is not a substantive judgment. *Id.* In any event, the two weaknesses assigned WSI's proposals for MAF and MSFC were minor mistakes and counterbalanced by WSI's "significant strength" in the Technical Scenarios component of the evaluation where WSI "demonstrated an exceptional understanding of the requirements." AR Tab 98, at 25566.

The 2009 SEB discussed the difficulties that KSC had in determining proposed staffing. WSI Cross Mot. at 38. Therefore, it was reasonable for the 2009 SSA to conclude that WSI's proposed staffing level was reasonable and not overstaffed. *Id.* at 39. In any event, the 2009 SSA observed that, if WSI's staffing proposal did contain inefficiencies, those inefficiencies would be reflected in the Price Factor. *Id.* This was a reasonable judgment. CIS's disagreement with the 2009 SSA does not show that the 2009 SSA's award decision was arbitrary and capricious. *Id.*

Likewise, CIS's assertion that the 2009 SSA improperly determined that the "significant strengths" of WSI's phase-in plan and CIS's quality management cancelled each other out, is nothing more than an attempt to substitute CIS's judgment for the 2009 SSA. *Id.* at 40.

Finally, the 2009 SSA did not "completely ignore" CIS's significant strength regarding the Small Business Participation Subfactor, because no discriminators were found. *Id.* at 40-41. In

fact, there is only a 1% difference in the overall proposed small business goal; that is not a compelling basis for a discriminator.  *Id.* at 41.  For this additional reason, the 2009 SSA did not act in an arbitrary or capricious manner in concluding there was no meaningful distinction between the proposals as to the Small Business Participation Subfactor.  *Id.*

### d.      The Plaintiff's Response.

CIS responds that the Government failed to rebut the argument that the 2009 SSA ignored the requirement of Section M that, "[a]dequacy and realism of resources will be considered in evaluating Mission Suitability as an indicator of the Offeror's understanding of the requirements." AR Tab 63, at 17321.  The 2009 SSA admitted that he did not give "much weight" to the weakness regarding MSFC and MAF and gave no weight to the KSC staffing weakness.  Pl. Resp. at 22. The 2009 SSA, however, did not have authority to ignore the requirements of Section M.  *Id.*  In addition, WSI's assertion that the 2009 SEB briefed the 2009 SSA about KSC staffing estimates is pure speculation.  *Id.* at 23.  The CO's May 18, 2009 e-mail to the 2009 SEB Chair advocating for the 343 WYE estimate in order to "look better," suggests otherwise.  *Id.*

Moreover, the Government makes no attempt to explain how the 2009 SSA rationally could dismiss the fact that WSI planned on using local law enforcement to augment security at MSFC.  *Id.*  It is against the law to supplement security personnel with local law enforcement and the burden is on the offeror to demonstrate an understanding of the Government's requirements. *Id.*  WSI clearly did not understand the requirements of the Solicitation.  *Id.*  Instead, WSI attempts to rewrite the Solicitation, claiming that the weakness assigned by the 2009 SEB did not reflect a lack of understanding, but instead reflected mistakes.  *Id.* at 22-23.

CIS also argues that the 2009 SSA gave improper weight to Technical Scenarios when he stated that WSI's weaknesses were "greatly offset" by WSI's "significant strength."  AR Tab 98, at 25566.   Technical Scenarios were only part of the evaluation for one Subfactor, whereas "adequacy and realism" was part of the evaluation for the entire Mission Suitability Factor.  Pl. Resp. at 23-24.  The Government, however, does not discuss the reasonableness of the 2009 SSA's decision to place more importance on one subfactor criteria, but ignoring WSI's failure to understand the Solicitation's requirements at three of the fourteen NASA locations.  *Id.* at 24.  In addition, the Government also failed to rebut CIS's argument that it was unreasonable for the 2009 SSA to find that CIS's and WSI's "significant strengths" under the Management Approach Subfactor were equal and therefore cancelled each other out.  *Id.*

Finally, the Government mischaracterizes CIS's "very good" rating for the Small Business Participation Subfactor.   The margin between the two proposals was not, as the Government contends, "small."   *Id.* at 25-26.  This was the only evaluation element where CIS received a higher adjectival rating.  *Id.* at 25.  The score difference between the proposals, however, is 6%, *i.e.*, twice as large as the 3% difference in the scores for the Mission Suitability Factor on which the 2009 SSA relied in awarding the contract to the higher-priced offer.  *Id* at 26.  Likewise, WSI's focus on the 1% difference between the proposals' Small Business Partcipation Subfactor scores, ignores the fact that the 2009 SEB found that CIS had "appreciably exceeded" NASA's aggressive small-business goals, and "significantly exceeded" two sub-category goals.  AR Tab 97, at 25524. On the other hand, WSI only "moderately exceeded" these goals.  AR Tab 97, at 25556.  As a

result, the 2009 SSA unreasonably minimized the difference between the proposals on the Small Business Participation Subfactor, without any justification.  Pl. Resp. at 27.

### e.  The Government's Reply.

The Government replies that CIS interprets the Solicitation to require that the 2009 SSA only consider the adequacy and realism of resources, when determining an offeror's understanding of the Solicitation's requirements.  Gov't Reply at 12.  The Solicitation, however, does not support this interpretation as it includes the adequacy and realism of resources under the overall category of Mission Suitability and provides that these resources "will be considered in evaluating Mission Suitability, as an indicator of the Offeror's understanding of the requirements."  *Id.* at 12-13.

The 2009 SSA gave proper weight to WSI's Technical Scenario responses, as they "demonstrated an exceptional understanding of the requirements" that "greatly enhances the potential for successful contract performance."  AR Tab 98, at 25566, 25568.  In addition, the 2009 SSA relied on the Technical Scenario responses to evidence that WSI fully understood the Solicitation requirements.  Gov't Reply at 14-15.  The 2009 SSA reasonably concluded that, to the extent that these staffing errors were not "readily correctable," these minor mistakes nevertheless did not rise to the level of a more fundamental lack of understanding.  *Id.* at 15.

In addition, the 2009 SSA acted reasonably in assessing each offeror's Management Approach considering both offerors' strengths in conducting his trade-off analysis, although he ultimately decided that WSI's submission was slightly superior.  *Id.* at 16.

Finally, although CIS scored 75 to WSI's 69 in Small Business Participation, this represented only a small piece of the overall assessment.  *Id.*  When all factors were considered together, WSI outscored CIS by 361 to 340.  *Id.*

### f.  The Defendant-Intervenor's Reply.

WSI replies that, contrary to CIS's assertion, the 2009 SSA considered the adequacy and realism of the resources in weighing the importance of the assigned weaknesses.  WSI Reply at 7.  The 2009 SSA reviewed the evaluation results, identified the value of discriminators, and made the award decision accordingly.  *Id.* at 2.  CIS has provided no reason for disturbing that decision.  *Id.*

Specifically, the 2009 SSA reasonably concluded that WSI's staffing "weaknesses" at MAF and MSCF did not reveal any fundamental misunderstanding about the Solicitation.  *Id.* at 8.  In fact, the 2009 SEB advised the 2009 SSA that one of these weaknesses was "very minor," (AR Tab 98, at 25565), and the CO described them as "nits."  AR Tab 119, at 26126.  On the other hand, WSI received a "significant strength" for the Technical Scenario response, demonstrating "an exceptional understanding of the requirements."  AR Tab 98, at 25566.  Since WSI's "weaknesses" and "significant strengths" were noted in the evaluation of the Technical Approach Subfactor, it was reasonable for the 2009 SSA to conclude that WSI's "exceptional" performance under the Technical Scenario was more important than the two minor "weaknesses."  WSI Reply at 9.

With regard to the Small Business Participation Subfactor, both offerors proposed the same percentage of small business participation, although the distribution of small business dollars among the subcategories did not have any great significance. *Id.* at 10. Therefore, the 2009 SSA's conclusion was reasonable. *Id.*

More importantly, CIS failed to demonstrate any prejudice resulting from these perceived errors, because it was WSI, not CIS, that was assigned a "weakness." *Id.* at 11. CIS can only show prejudice if WSI should have received a "significant weakness" for overstaffing. *Id.* CIS cannot meet this burden. First, WSI's initial "significant weakness" involved two facilities and 62 WYE. *Id.* Subsequently, WSI removed more than 60 WYE from WSI's proposal. *Id.* at 11. Second, even if WSI's perceived overstaffing remained at 23 WYE, this alone is not sufficient to generate a "significant weakness." *Id.* at 12. Third, CIS was not penalized, because CIS did not receive the "weakness," WSI did. *Id.* Finally, even if the 2009 SSA accepted the 2009 SEB findings *in toto,* WSI's rating was still measurably better than CIS's proposal in the Technical Approach Subfactor. *Id.* at 13. Therefore, despite the errors alleged by CIS, it was the considered judgment of the 2009 SSA that WSI's overall proposal represented the "best value" to the Government. *Id.*

### 3.    The Court's Resolution.

Count VI is a reprise of the themes of Count III, IV, and V. Regarding Technical Scenarios, contrary to CIS's contentions, the 2009 SSA viewed WSI's staffing weaknesses at MSFC and MAF as "very minor" and "readily correctable." AR Tab 98, at 25565-66. Moreover, the 2009 SSA observed:

> Even if one believed this weakness evidenced a lack of understanding, then this weakness was greatly offset by the significant strength [WSI] received for its response to the technical scenarios which the [2009] SEB said demonstrated an exceptional understanding of the requirements.

AR Tab 98, at 25566.

Nevertheless, CIS argues that the 2009 SSA's "offset" was improper, because the words "adequacy and realism" appear in the general description of the Mission Suitability Factor and Technical Approach Subfactor. Pl. Resp. at 23-24. But, CIS ignores the Solicitation's structure that lists Technical Scenarios as a part of the "Understanding the Requirements" element of the Technical Approach Subfactor. Although the Solicitation uses the phrase "adequacy and realism" in the general description of the Technical Approach Subfactor, the more specific "Understanding the Requirements" element of the Technical Approach Subfactor details exactly how NASA will evaluate this element of Technical Approach. AR Tab 63, at 17321-23. The 2009 SSA considered WSI's significant strength in the Technical Scenarios a better indicator of WSI's understanding of the requirements than the weaknesses assessed for overstaffing at individual NASA facilities. AR Tab 98, at 25566. The court discerns no reason why the 2009 SSA's technical judgment was in error. *See State Farm,* 463 U.S. at 43 ("[W]e must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (internal quotations omitted); *see also Weeks Marine*, 575 F.3d at 1371 ("If the court finds a

reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.") (internal citations and quotations omitted).

Likewise, CIS's challenge of the 2009 SSA's decision to offset the offerors' respective "significant strengths" under the Management Approach Subfactor is equally unpersuasive. The Solicitation makes no distinction between the relative importance of the Phase-In Plan and the Management Plan elements of Management Approach Subfactor. AR Tab 63, at 17323-26. The offerors received the same number of "significant strengths" and "regular strengths," but for different reasons. The 2009 SSA concluded that "[CIS]'s somewhat superior proposal for its business and information systems[23] was no more or less a distinguisher than [WSI]'s somewhat superior proposal for its comprehensive phase-in plan." AR Tab 98, at 25570. In the absence of a genuine distinction between these evaluation criteria, the court is not in a position to question the 2009 SSA's view that "there was no distinguishing advantage to either Offeror." AR Tab 98, at 25570. Although CIS presents a plausible rationale for why its "significant strength" should have been considered more important than WSI's, this fact is not sufficient to render the 2009 SSA's decision arbitrary and capricious. *See Madison Servs., Inc.* v. *United States*, 92 Fed. Cl 120, 128 (2010) ("It is axiomatic that the demonstrated rationality of one possible conclusion does not negate the rationality of the alternative or even opposite conclusion. After all, reasonable minds can and do differ."). The 2009 SSA satisfactorily explained the relevant factors weighed in making his decision in the context of the Solicitation's evaluation criteria and the overall objectives of the procurement. *Id.* ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (internal citations omitted). Moreover, as previously discussed, the court is not at liberty to substitute its judgment for that of the 2009 SSA. *See State Farm,* 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). Nevertheless, assuming that the 2009 SSA's analysis of CIS's Management Approach Subfactor was flawed, CIS failed to demonstrate how it was prejudiced by this aspect of the 2009 SSA's decision, particularly since WSI had higher ratings. *See Statistica, Inc.* v. *Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996) ("Thus, for [a Plaintiff] to prevail it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error.").

Contrary to CIS's third argument, the 2009 SSA also did not "completely ignore" CIS's significant strength in the Small Business Approach Subfactor. In fact, the 2009 SSA concurred with the 2009 SEB that CIS's proposal warranted a "significant strength." AR Tab 98, at 25567. The 2009 SSA, however, did not find this "significant strength" to be a discriminator for two reasons: (1) CIS greatly exceeded the goals in two sub-categories, and (2) any advantage to CIS must be evaluated in light of WSI's demonstrated past performance in achieving Small Business goals. AR Tab 98, at 25571-72. Therefore, the 2009 SSA found that both proposals exceeded the Small Business Approach Subfactor by similar percentages and concluded there was little risk that either offeror would not meet or exceed the Small Business objectives. AR Tab 98, at 25571-72.

---

[23] "Business information systems" was an element of the Management Approach Subfactor. AR Tab 63, at 17324.

Again, CIS also failed to demonstrate how this decision caused CIS prejudice.  Even if the 2009 SSA simply accepted the 2009 SEB's findings, without identifying discriminators, the overall scoring under the Mission Suitability Factor would remain unchanged.  Therefore, the 2009 SSA's tradeoff analysis still would have compared "[CIS]'s lower price against [WSI]'s superior proposal relative to Mission Suitability and slightly better Past Performance."  AR Tab 98, at 25572.  In addition, the 2009 SSA, however, identified and thoroughly explained the benefits of WSI's proposal that warranted paying a higher price.

Finally, the 2009 SSA's "trade-off" analysis did not evidence any disparate treatment.  *See* FAR 15.101(c) ("This process permits tradeoffs *among* cost or price and non-cost factors[.]") (emphasis added); *see also* FAR 15.308 ("Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.").  Although the 2009 SSA valued some strengths and weaknesses more than others, that does not render his decision arbitrary and capricious.  The 2009 SSA provided a sufficient and reasonable rationale for the business judgments and tradeoffs that he made in deciding that the offerors' Small Business Approach was not a discriminator.  No more is required.

Therefore, the court has determined that, based on the Administrative Record, the 2009 SSA award of the NPS Contract to WSI was "within the bounds of reasoned decision making," particularly since this was a negotiated procurement.  *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69; *Blackwater Lodge & Training Ctr., Inc.* v. *United States,* 86 Fed. Cl. 488, 514 (2009) ("Mere disagreement with an agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious.").  One final observation.  In the end, the NPS Contract was to be awarded to the proposal that represented the "best value" to the Government.  The process of making a "best value" decision is not merely an exercise in adding up strengths and weaknesses, but a comprehensive comparative analysis that necessarily is influenced by the procurement official's expertise.  *See Galen Med. Assocs.*, 369 F.3d at 1330 (explaining that, in "best value" procurements, a "higher [evidentiary] burden exists because the contracting officer engages in what is 'inherently a judgmental process.'").  The court is satisfied that the 2009 SSA was very well qualified to evaluate the 2009 SEB's final findings[24] and properly

---

[24] The 2009 SSA was Mr. Thomas Leudtke, Associate Administrator for Institutions and Management, with oversight responsibility for the management of the institutional functional offices and leadership responsibility for providing effective and efficient institutional support integration and alignment of support activities, and consistency of approach to enable NASA to accomplish its missions.  AR Tab 104, at 025976.  Prior to becoming Associate Administrator, Mr. Leudtke was the Assistant Administrator for Procurement, heading NASA procurement activities and managing the agency's procurement functions.  In this capacity, he guided and oversaw some of NASA's most "far reaching" initiatives including Competitive Sourcing, Performance Based Competitive Sourcing.  Performance Based Contracting, Risk-Based Acquisition Management, and the many facets of electronic commerce.  *Id*.  He represented NASA procurement to the Executive and Legislative branches of the federal government, industry and international organizations.  *Id*.  Leudtke was appointed the Associate Administrator for Procurement on June 14, 1999.  *Id*.

exercised his independent judgment in weighing the respective strengths and weaknesses of both proposals.

## VII.  CONCLUSION.

For these reasons, Plaintiff's Motion For Judgment On The Administrative Record On Counts III-VI is denied.  The Government's Cross Motion and Defendant-Intervenor's Cross Motion For Judgment On The Administrative Record on Counts IV-VI are granted.  With exception of paragraphs 177-78, and 182 of the October 6, 2009 Complaint, the Government's Cross Motion and Defendant-Intervenor's Cross Motion For Judgment On The Administrative Record On Count III are also granted.

Plaintiff will advise the court by close of business July 30, 2010 whether the court should now proceed to adjudicate the remaining allegations in the October 6, 2009 Complaint.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**

---

Prior to this, Leudtke was the Deputy Associate Administrator for Procurement.  In this position, he assistant the Associate Administrator for Procurement in managing procurement policies.  *Id.*  Previously, he was the director of [the] Contract Pricing and Finance Division.  He was responsible for NASA procurement policy in the areas of pricing, profit, contract finance, type-of-contract, contract audit support, and related areas and devised the current Award Fee policy.  *Id.*

Leudtke began his career as a contract specialist with the Naval Air Systems Command (NAVAIR), procuring avionics, research and development, and services.  *Id.*  He was the procuring contracting officer for the Industrial Modernization Incentives Program at NAVAIR, as well as for the Penguin, Harpoon, and SLAM missiles.  *Id.*  He subsequently served as the Director of the Pricing Policy Division at Army Materiel Command Headquarters.  *Id.*  Immediately prior to coming to NASA he was the Chairman and Army member at the Cost Principles Committee (Part 31) of the DAR Council.  *Id.*  Leudtke received a bachelor of science degree in Political Science and History from the University of Wisconsin-Parkside.  He received a master's in business and a J.D. from the University of Wisconsin-Madison.  *Id.*